IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
October 3, 2017 Session

## VERN BRASWELL v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
No. 05-03038      Paula L. Skahan, Judge

_____

### No. W2016-00912-CCA-R3-PC

_____

The Petitioner, Vern Braswell, appeals the post-conviction court's denial of his petition for post-conviction relief in which he challenged his conviction for second degree murder and his twenty-four-year sentence. On appeal, the Petitioner contends that he received ineffective assistance of counsel at trial and that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to provide the defense with statements of witnesses, items recovered from the Petitioner's home, and the contents of a sealed envelope that was discovered during the pendency of post-conviction proceedings. Upon reviewing the record and the applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and NORMA MCGEE OGLE, J., joined.

Lauren M. Fuchs, Memphis, Tennessee, for the appellant, Vern Braswell.

Herbert H. Slatery III, Attorney General and Reporter; Rachel W. Willis, Deputy Attorney General; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Marques Young and Pam Stark, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

The Petitioner was charged with first degree premeditated murder for killing his wife, Sheila Braswell, by manual strangulation. The Petitioner argued at trial that the

victim's death was accidental and occurred after he and the victim engaged in erotic asphyxiation. The jury convicted the Petitioner of second degree murder, and the trial court sentenced him to twenty-four years as a Range I, standard offender. This court affirmed the Petitioner's conviction and sentence on direct appeal. *See State v. Vern Braswell*, No. W2006-01081-CCA-R3-CD, 2008 WL 238014, at *1 (Tenn. Crim. App. Jan. 28, 2008), *perm. app. denied* (Tenn. Aug. 25, 2008).

## Trial Proceedings

The evidence presented at trial was summarized by this court in its opinion on direct appeal as follows:

> Pauline Washburn testified that her daughter Sheila Braswell, the victim, had been married to Defendant for ten years, and the couple had two young sons. Defendant and the victim resided together with their children in Cordova, Tennessee. Ms. Washburn said that she received a telephone call from Defendant on November 5, 2004, at 4:34 a.m. Defendant told Ms. Washburn that the victim was not breathing. Defendant said that he had fallen asleep around 1:30 a.m., and when he woke up at approximately 3:30 a.m., the victim was floating in the bathtub.

> Ms. Washburn drove to her daughter's residence where several people had already gathered. Ms. Washburn and Defendant sat together on the living room couch for a few minutes. Defendant was wearing a white terry cloth robe which was wet. Defendant, who was crying, said that the victim had taken a bath after the couple had sexual intercourse and Defendant had fallen asleep. Defendant said that sometimes after sexual intercourse, the victim's hip would hurt, and she got into the Jacuzzi bathtub to relieve the cramps. Ms. Washburn said that Defendant kept saying, "I should have never let her get in the tub." Ms. Washburn did not understand why Defendant made this statement if a bath after sexual intercourse was not unusual in the victim's routine.

> Ms. Washburn said that the victim was approximately four feet, eleven inches tall and weighed between one hundred and twenty-five and one hundred and thirty pounds. Ms. Washburn returned to her daughter's residence the following day to retrieve some of the victim's personal property and clothes for the victim's two sons. Ms. Washburn found some mail in a bag in the kitchen. The mail included a copy of a divorce decree, a request for an order of protection dated April 1996, a one hundred-dollar

bill and a twenty-dollar bill, and a check in the amount of $288.50, made payable to the victim's divorce attorney.

Angela Tall Snyder testified that she and the victim worked part-time providing in-home spa treatments. Ms. Snyder stopped by the victim's house on November 4, 2004, at approximately 10:00 p.m. The victim was talking on the telephone. Ms. Snyder said that she stayed approximately thirty minutes and did not see Defendant or his car during this time.

Roosevelt Coleman, a communications supervisor with the Memphis Police Department, maintains the documentation of 911 calls placed to the department's dispatchers. Mr. Coleman said that an event chronology is generated by the computer as soon as a 911 call is received, and a time factor is assigned for the call as soon as possible. The time assigned to Defendant's 911 call was 3:57 a.m. The event was closed at 7:43 a.m. when responding officers were placed back into service. On cross-examination, Mr. Coleman acknowledged that the dispatcher had noted on the event chronology that Defendant was hysterical and screaming during the telephone call.

Lieutenant Fred Jackson, with the Memphis Fire Department, was the first responder to arrive at the crime scene. Defendant was standing outside the residence wearing a white bathrobe. Lieutenant Jackson followed Defendant into the couple's bedroom. The victim was in the adjacent bathroom's bathtub, with the lower part of her body inside the bathtub, and the upper half of her body hanging over the edge. Lieutenant Jackson said that the victim had no visual signs of life. Lieutenant Jackson and an emergency medical technician lifted the victim out of the tub and placed her on the bedroom floor.

Lieutenant Jackson said that he attempted to console Defendant who kept asking what the emergency medical technicians could do for the victim. Lieutenant Jackson stated that Defendant commented that he "shouldn't have let her have that drink or [he] should have awakened [her] or something to that effect." Defendant made and received several cell phone calls while he was with Lieutenant Jackson. Lieutenant Jackson did not remember seeing any children in the home.

Lieutenant Jackson testified that he noticed that the air in the bathroom was humid and moist when he arrived and that the water in the

- 3 -

bathtub was warm. Lieutenant Jackson said that the victim was a small woman, and it was not difficult to lift her out of the bathtub. Lieutenant Jackson added that the victim's legs appeared to be stiff.

Baba Tanzy, an emergency medical technician with the Memphis Fire Department, testified that he and a paramedic, Matthew Wayne Hamm, accompanied Lieutenant Jackson to the Defendant's residence. They arrived at approximately 4:00 a.m. Mr. Tanzy said that Defendant told him that the victim had taken a bath around 2:00 a.m. after the couple had sexual intercourse. Defendant woke shortly before 4:00 a.m. and discovered the victim in the bathtub. Mr. Tanzy said that the water in the bathtub was warm when he arrived. Mr. Tanzy noticed small red marks on each side of the victim's neck and broken blood vessels in her eyes, which indicated to Mr. Tanzy that the victim had died by suffocation or asphyxiation. Mr. Tanzy said that the victim's arms were stiff.

Mr. Hamm testified that the victim showed no signs of life when the medical personnel arrived, and she was in rigor mortis. Mr. Hamm stated that the victim had a condition in her eyes known as petechiae which consisted of broken blood vessels in the cornea. Mr. Hamm said that this condition indicated that the victim had suffered a strangulation trauma. Mr. Hamm noted three red marks on the victim's neck and stated that the froth in the victim's mouth indicated the presence of water in the victim's lungs. Mr. Hamm said that the water in the bathtub was hot. He checked the water's temperature at 5:07 a.m. and it measured 94.6 degrees Fahrenheit. Officer David Galloway with the Memphis Police Department testified that the bathtub was five feet, one inch long, and two feet, ten inches deep.

Sergeant Andrew Kjellin, with the Memphis Police Department's felony response unit, arrived at Defendant's home at approximately 5:30 a.m. Defendant told Sergeant Kjellin that his wife had taken a bath after he fell asleep around 1:30 a.m., that he woke up between 3:40 a.m. and 3:50 a.m., and that he discovered the victim in the bathtub. Defendant said that he called a friend named Brian, and then called 911. Defendant told Sergeant Kjellin that he could not lift the victim out of the bathtub. Sergeant Kjellin said that Defendant, in a separate vehicle, followed him back to the police station to make a statement. On cross-examination, Sergeant Kjellin acknowledged that he did not notice any wounds on Defendant, and that there were no signs of a struggle at the crime scene.

Sergeant William D. Merritt, with the Memphis Police Department's homicide squad, testified that Defendant arrived at the police station with a friend on November 5, 2004, between 8:30 and 8:45 a.m. Defendant was advised of his Miranda rights and he executed a written waiver of those rights. In his written statement, Defendant said that he and the victim

> were in the Jacuzzi together around midnight. Relaxing and bathing. We began getting intimate and engaging in sex. As a result of an inadequate amount of lubrication, we continued sex in the bedroom and in the bed. At approximately 1:30 a.m. we stopped and joked about who was going to let the water out of the Jacuzzi. She commented about an aching cramping pain in her abdomen. Then she got up and walked with a limping motion to the bathroom. And shortly thereafter, I heard in the bathroom [the] Jacuzzi faucet, as well as the Jacuzzi jets turn on. At which time or shortly thereafter, I fell asleep. It was approximately 1:30 a.m. to 1:40 a.m. At approximately 3:50ish to 4:00 a.m., I noticed that she wasn't in the bed. I went to check on her and she was somewhat submerged in the water. I called 911 and Brian James as well as a host of other family and friends trying to get help.

Defendant said that the air jets in the bathtub were still operating when he found the victim, and he added that the victim's head and face were under water. Defendant stated that he noticed that "the pink bath pillow with suctions" had detached from the bathtub and was floating in the water. Defendant said that the victim had drunk one twelve-ounce bottle of Skyy Blue malt beverage before midnight and another bottle while they were in the bathtub. Defendant said that it was not unusual for the victim to fall asleep in the bathtub while the air jets were operating. Defendant stated that he attempted to get the victim out of the bathtub but was unsuccessful.

Sergeant Merritt said that Defendant was crying and emotional during the interview, and he received and made several calls on his cell phone while he was at the police station. Sergeant Merritt said that Defendant did not mention that he and the victim had engaged in the practice of erotic asphyxiation that evening. Defendant was arrested on November 6, 2004.

Sergeant Merritt said that after his arrest, Defendant's telephone calls were monitored while he was incarcerated in the county jail. Defendant made approximately thirty-five calls over a two-month period. During the telephone conversations, Defendant commented that "the soldier" was underground. Sergeant Merritt believed that Defendant was referring to his girlfriend, Kristie Woods, and meant that Ms. Woods could not be found. Later, Defendant called Ms. Woods at her place of employment and told her to refer to herself as Defendant's cousin when she called him. Defendant also told Ms. Woods to send him letters at his mother's address. Defendant discussed the victim's life insurance with his mother, who told him that the insurance proceeds were not being released because of the murder investigation. The tape of Defendant's telephone conversations while he was in jail was introduced as an exhibit at trial and played for the jury.

Robert D. Burton, a service manager for Watson's Pools and Spas, explained the operation of a bathtub outfitted with air jets such as the one in Defendant's residence. Mr. Burton testified that after the bathtub is filled with hot water, air is pumped into the water through the jets. The air cools the bath water quickly, and more hot water generally has to be added in approximately fifteen to twenty minutes. Mr. Burton stated that if the air jets in a bathtub ran for two hours, the water would be cold at the end of the period. If the jets were turned off, the water temperature in the bathtub would fall to approximately eighty degrees over a period of two hours.

Benjanette Sturdevant, with Nextel Communications, identified the telephone records pertaining to Defendant's cell phone number. Ms. Sturdevant testified that according to her records, the first call on November 5, 2004, from Defendant's cell phone was placed at 3:55 a.m. and twenty-five calls were made between 3:55 a.m. and 4:40 a.m. Of these, seventeen calls were made to telephone number 901-737-6100, and two calls were made to telephone number 901-484-8568.

Lieutenant John E. Mitchell, with the Memphis Police Department, testified that he knew Defendant socially and that he and Defendant were members of a professional fraternity, Omega Psi Phi. Lieutenant Mitchell said that his home telephone number was 901-737-6100, and his cell phone number was 901-484-8568. Lieutenant Mitchell said that he was in Texas on November 5, 2004. When he awoke that morning, Lieutenant Mitchell noticed that he had missed several telephone calls from a number reflected on his caller identification. Lieutenant Mitchell dialed that telephone

number at approximately 6:00 a.m., and Defendant answered. Defendant was distraught and told Lieutenant Mitchell that his wife was dead. Lieutenant Mitchell was unaware that Defendant had called him numerous times that morning before Lieutenant Mitchell returned the call.

Officer Myron Fair, with the Memphis Police Department, was also a member of the Omega Psi Phi fraternity. Officer Fair discovered that he had missed a telephone call from Defendant on November 5, 2004, which had been made sometime before he woke up. Officer Fair returned the call between 9:00 and 9:30 a.m. Defendant told Officer Fair that he could not talk because he was about to give his statement to the police. Defendant said, "[T]hese people think I killed my wife." Defendant did not mention to Officer Fair or Lieutenant Mitchell that the victim died after engaging in erotic asphyxiation.

Officer Troy Walls, with the Millington Police Department, testified that he responded to a 911 call placed by the victim on April 17, 1996. He found the victim upset and crying when he arrived at the victim's residence at approximately 11:30 p.m. Officer Walls observed a scratch over the victim's right eye and on her right arm, and her face was flushed. The victim told Officer Walls that Defendant had hit her and held her in a choke hold. There were signs of an altercation in the town house. Officer Walls said that Defendant was not in the house when he arrived, and he advised the victim to obtain a warrant for his arrest.

William Mangum, the custodian of the records for the Shelby County Circuit Court, identified an order of protection against Defendant which was requested by the victim on April 19, 1996. In the protection order, which was introduced as an exhibit at trial, the victim stated that during an argument, Defendant slapped and choked her, cutting off her air supply. An order of protection was entered on May 10, 1996.

Mr. Mangum also identified a complaint for divorce filed by the victim on June 15, 2004. Mr. Mangum said that his records showed that an order for nonsuit was entered in this case on November 9, 2004.

Dr. Joye Maureen Carter performed an autopsy on the victim on November 5, 2004. Dr. Carter was informed before the autopsy began that the victim had died as a result of an accidental drowning. Dr. Carter testified, however, that the victim's neck injuries and the presence of hemorrhaging in her eyes indicated that the cause of death was not an

accidental drowning. Dr. Carter said that the victim had petechiae, or pinpoint hemorrhages, all over her face, including her neck, the lining of the lips, and the gums. Dr. Carter explained that petechiae are caused by an increased pressure on the capillaries.

Dr. Carter observed oval-shaped contusions on the victim's neck. An examination of the interior of the neck revealed patchy hemorrhaging under all six layers of the neck's muscles. Hemorrhaging was also present in the soft tissue of the pharynx. Petechiae were present throughout the voice box and vocal chords. Dr. Carter stated that these injuries were consistent with manual strangulation. The absence of white blood cells at the injury sites indicated that the injuries were recently inflicted.

Dr. Carter said that some water was present in the victim's lungs, but not of a quantity to suggest that the victim's death was caused by drowning rather than strangulation. Dr. Carter acknowledged that it was possible for water to be present in the lungs if the victim was strangled in water. Dr. Carter said that the skin on the bottom of a person's hands and feet wrinkles when submerged in water because the water soaks in between the layers of skin. Dr. Carter said that such wrinkling usually occurs, whether the person is alive or dead, within fifteen to twenty minutes of being submerged in water. Dr. Carter said that an examination of the victim's hands and feet revealed only a minimal amount of wrinkling and did not support a finding that the victim had been submerged in water for a significant length of time.

Dr. Carter said that constant pressure around the neck would lead to death in three to seven minutes. Dr. Carter observed some early signs of rigor mortis when the autopsy was performed at approximately 9:00 a.m. on November 5, 2004. Dr. Carter said it was her understanding that the victim's body had been discovered approximately six hours earlier, and signs of rigor mortis generally became evident approximately six hours after death. Based on her findings, Dr. Carter estimated that the time of death was between the time of the discovery of the body to one or two hours earlier. Dr. Carter stated that no drugs or alcohol were found in the victim's body.

Dr. Carter said that she had performed autopsies on people who had died from erotic asphyxiation. Dr. Carter said that a crime scene investigation was very important to determine if the death resulted from such activity. Dr. Carter said that she usually looked for ligatures, pornography, or signs of a safe escape such as something that needs to be

pulled to release the choking. Dr. Carter said that generally the victim is found in the position where they accidentally asphyxiated. Dr. Carter stated that the victim's injuries were not consistent with a death from erotic asphyxiation because there were multiple injuries to the victim's neck muscles as opposed to a pattern made by some type of ligature.

On cross-examination, Dr. Carter acknowledged that there were no fractures present in the victim's thyroid cartilage or hyoid bone, and there were no defensive wounds. The victim's acrylic fingernails were not damaged. Dr. Carter disagreed that the victim's injuries were consistent with the application of a choke hold. Dr. Carter stated that placing the victim in a choke hold by using the forearm would have inflicted a wider distribution of pressure related injuries as opposed to the individual areas of injury found in the victim's body.

Kristie Woods testified that she met Defendant in the spring of 2002, and the couple dated until the victim's death. Ms. Woods said that she and Defendant were involved sexually during this period of time. Defendant told Ms. Woods that he was married around Thanksgiving 2002, but she decided to continue the relationship. After Ms. Woods graduated from college in 2003, Defendant subsidized the cost of her apartment. In October 2004, Defendant told Ms. Woods that he would "make things right." Ms. Woods believed at this time that Defendant meant that he would leave the victim.

Ms. Woods said that she and Defendant belonged to a social motorcycle club. Defendant also owned a business which rented a facility for parties and gatherings. Ms. Woods helped with the business but was not paid for her services. The funds generated by the rental business were used to support the motorcycle club's activities. Ms. Woods said that she saw the victim at a motorcycle sports track one time when Ms. Woods was with Defendant.

In June 2004, Ms. Woods and Defendant attended a party together. Ms. Woods said that Defendant became upset with her because she was dancing with other people. They argued, and Defendant put his hands around her neck and applied pressure. Defendant told Ms. Woods not to call him anymore. Ms. Woods responded, "okay," and left the party.

Ms. Woods said that she called the victim as she drove away from the party. She told the victim who she was and gave the victim directions

to her apartment. After the victim arrived at Ms. Woods' apartment, the two women drove to a local fast food restaurant to talk. Ms. Woods said that Defendant repeatedly called her on her cell phone while she and the victim were talking, but Defendant did not know that Ms. Woods was with the victim. Ms. Woods arrived back at her apartment around 6:00 a.m., and Defendant arrived shortly thereafter. Defendant confronted Ms. Woods about calling the victim and then left. Ms. Woods said Defendant kept calling her after the incident, and a few days later the two resumed their relationship.

In September 2004, Defendant confronted Ms. Woods about a man she had met at a Labor Day party. Defendant obtained a copy of Ms. Woods' telephone records and argued with her when Ms. Woods returned from a weekend trip to Mississippi where the man attended college. Ms. Woods said that Defendant grabbed her by the arms and threw her on the couch, and then banged her head against the wall. Ms. Woods managed to escape his grasp, and they wrestled in front of the couch. Defendant grabbed her by the neck and banged her head against a glass table as he applied pressure to her neck. Ms. Woods said that Defendant then left the apartment.

Ms. Woods acknowledged that she slashed the victim's car tires in September 2004, because she was angry with Defendant. Ms. Woods left the victim $120 in cash in her mailbox to cover the cost of replacing the tires. Ms. Woods said that she resumed her relationship with Defendant after the September altercation and continued to have contact with him after his arrest until June 2005.

Ms. Woods said that she did not know what the term "erotic asphyxia" meant before the trial. Ms. Woods acknowledged that Defendant sometimes placed his forearm against Ms. Woods' neck while they had sexual intercourse. Ms. Woods said that Defendant would apply pressure to her neck but not to a great extent.

Ms. Woods said that Defendant was at her apartment on the evening of November 4, 2004, and left at approximately 8:45 p.m. to meet a repairman at the motorcycle club. Ms. Woods telephoned Defendant between 10:30 and 11:00 p.m. to tell him that she was going to bed. Ms. Woods said that Defendant told her that he was driving home from the club. Ms. Woods acknowledged that she avoided the investigating officers for a period of time after Defendant's arrest.

- 10 -

On cross-examination, Ms. Woods said that her nickname in the motorcycle club was "the soldier." Ms. Woods said that she and Defendant were open about their relationship with the other members of the club, and the victim knew about her relationship with Defendant before Ms. Woods called her….

Ms. Woods said that it was not unusual for Defendant to make numerous cell phone calls during any given day. Ms. Woods said that she was not able to reach Defendant immediately on November 5, 2004. When she finally got through, Defendant was crying and hysterical.

Ms. Woods acknowledged that Defendant had not taken any steps to end his marriage during their relationship, and she was under the impression that Defendant and the victim would continue to live together. Ms. Woods said that she was not afraid that Defendant would hurt her. Ms. Woods stated that she was aware of Defendant's reputation in the community and said that Defendant "was always trying to lend a helping hand."

On redirect examination, Ms. Woods said that she did not know either Lieutenant Mitchell or Officer Fair. Ms. Woods admitted that she was not aware of Defendant's altercation with the victim in 1996 which led to the issuance of an order of protection. Ms. Woods said that Defendant told her in June 2004 that the victim had filed for divorce. Ms. Woods added that she was not aware that Defendant had two other prior physical altercations with the victim. Ms. Woods said that she was not aware that Defendant had been convicted of assault in 1990 and misdemeanor theft in 1992. Ms. Woods testified that knowing these facts would change her opinion about Defendant's reputation in the community.

On recross-examination, Ms. Woods said that the victim did not mention any of her prior altercations with Defendant during their conversation in June 2004.

Sheronda Smith, the victim's friend, testified that she and the victim talked to each [other] several times each day by telephone. Ms. Smith talked to the victim at approximately 9:00 p.m. and again at approximately 11:00 p.m. on November 4, 2004. Ms. Smith helped straighten up the victim's bedroom and bathroom during the afternoon of November 5, 2004. Ms. Smith said that the bathtub was still filled with water. When the water was drained, Ms. Smith found some hair which she believed to be that of

- 11 -

the victim and the victim's earrings. Ms. Smith said that she also found what appeared to be another earring in the bottom of the tub. Ms. Smith stated that earlier that afternoon, Defendant told her he had lost his nipple ring. Defendant went into the bedroom to search for the ring but could not find it.

On cross-examination, Ms. Smith said that she accompanied Defendant and the victim to North Carolina. Ms. Smith said that there was a display at the hotel with sadomasochistic overtones, and that Defendant appeared interested in the display. Ms. Smith said that she was aware that Defendant had pierced his nipples.

Vera Cole, Defendant's sister-in-law, testified that the victim came to her house one night between 10:00 p.m. and 11:00 p.m., crying and upset. The victim told Ms. Cole that Defendant had pulled her down a flight of stairs by her hair.

Ms. Cole said that she and her husband had a fight on November 4, 2004, and Mr. Cole left the house without his cell phone. Ms. Cole said that the cell phone rang at approximately 1:36 a.m. and again at 1:38 a.m. Defendant's cell phone number was displayed on the caller identification, so Ms. Cole did not answer the calls. Ms. Cole thought her husband had gone to Defendant's house and was calling her on Defendant's cell phone. On cross-examination, Ms. Cole acknowledged that the two telephone calls did not appear on the telephone records introduced as exhibits but insisted the calls were placed with Defendant's cell phone.

Magra Harden testified that she had known the victim since 1993 when the two women were students at The University of Tennessee. The victim lived with Ms. Harden during the spring and summer of 1995 while Defendant was a patient at a rehabilitation facility in Shelby County. Ms. Harden said that the victim came home one night after visiting Defendant at the facility upset, confused, and distraught. The victim told Ms. Harden that Defendant had choked her during an argument. Ms. Harden said that both sides of the victim's neck were discolored, and the victim's voice was raspy.

Defendant testified on his own behalf. Defendant stated that he and the victim met at a party at college and dated for two or three years before they married. Defendant said he has a master's degree from the University

of Memphis in administration and supervision. At the time of the incident, Defendant was the assistant principal at Hanley Elementary School.

Defendant acknowledged that he struck the victim in 1995 during an argument but denied that he dragged her down a flight of stairs. Defendant said that the victim lived with Ms. Harden for a period of time during their marriage, and the victim had an affair during this time. Defendant found some letters from the man and confronted the victim. Defendant said the couple argued and he "snapped." Defendant acknowledged that he hit the victim and held her in a choke hold on this occasion. Defendant said that he did not have any other altercations with the victim prior to her death.

Defendant testified that he and the victim had grown apart when he met Ms. Woods. Defendant said the relationship at first was just sexual, but he and Ms. Woods grew fond of each other. Defendant told Ms. Woods that he was married when the relationship became serious. Defendant stated that Ms. Woods grew obsessive about the relationship during the spring of 2004. Ms. Woods would telephone the victim and hang up. She also sent the victim text messages and e-mail. During the party in June 2004, the victim called Defendant and told him she was still getting messages from Ms. Woods. Defendant grew angry, grabbed Ms. Woods, and told her to leave his family alone. Defendant pushed Ms. Woods away and left the party.

Defendant's tenth wedding anniversary occurred during the Labor Day weekend. Ms. Woods was upset and slashed the victim's tires. Defendant went to Ms. Woods' apartment and confronted her about the incident. Defendant said he grabbed Ms. Woods and told her to leave the victim alone. Defendant denied that he banged Ms. Woods' head against a table or the wall.

Defendant said that he and the victim learned about various sexual practices from pornography and felt their experiments were "adventuresome." Defendant stated that he and the victim frequented a "swingers club" in Shelby County. Defendant added that the victim first suggested that they engage in erotic asphyxiation. Defendant testified that he would get behind the victim and place his arm around her neck, sometimes with his hands against the side of her neck. Defendant said that the victim would signal him with her fingers. If his hold was too tight, the victim would tap her fingers; if his hold was too loose, the victim would pinch him. When her fingers grew limp, Defendant would release his hold.

- 13 -

Defendant said that the choking sensation heightened sexual pleasure. Defendant added that after he released his choke hold, he would lay the victim down until she "came around." Defendant said that they had engaged in the practice for approximately two years on a weekly basis.

On November 4, 2004, Defendant attended football practice with his sons, then returned home. Defendant said that he went to his club after dinner to meet a repairman. Defendant left the club at approximately 10:45 p.m. He received a telephone call from Ms. Woods at 10:57 p.m. After he arrived home, Defendant and the victim took a bath together which eventually led to sexual activities. The victim took a bath and then woke Defendant up at approximately 2:45 a.m. The victim asked for a "fixie," her term for erotic asphyxiation. The couple got into the bathtub and turned the air jets on. Defendant said the water was very hot. Defendant proceeded to choke the victim. When her fingers grew limp, he released his hold and laid her back in the water with an inflatable pillow beneath her head. Defendant said that he went to bed and dozed off. He woke up between 3:45 and 3:50 a.m. and noticed that the victim had not come to bed. He went into the bathroom and found the victim submerged in the bath water.

Defendant said that he tried to lift the victim out of the water by grabbing her around the neck area and then around the waist, but he was unsuccessful. Defendant said that every time he let go of the victim, something pulled her back into the water. Defendant believed the victim's hair may have been caught in one of the air jets.

Defendant acknowledged that he made numerous cell phone calls after he discovered the victim's body. He said he called Captain Fifer because Captain Fifer had told Defendant to call him if he ever needed help. Defendant said that he did not tell the investigating officers that he and the victim had engaged in erotic asphyxiation because the victim would not have wanted him to disclose that activity. Defendant said his counsel then advised him not to make any more statements to the police.

Defendant identified several "sex toys" which were present in the couple's bedroom at the time of the incident. Defendant acknowledged that he discussed the victim's insurance policy while he was confined in the county jail. Defendant said his mother asked about the release of the proceeds because she had the custody and care of Defendant's sons. Defendant said that he never intended to end his marriage with the victim.

He acknowledged that he had previously attended a rehabilitation facility as a result of alcohol and cocaine abuse. Defendant said that he had been sober for ten years.

Defendant denied that he intentionally killed his wife, or that he choked her to death in anger. When asked if the victim's death was an accident, he responded, "Yes."

On cross-examination, Defendant said that he was five feet, four inches tall and weighed between 170 and 175 pounds at the time of the victim's death. Defendant acknowledged that the victim visited him at the rehabilitation center, but he denied that he choked her on this occasion. Defendant said that his relationship with Ms. Woods ended in June or July, 2004. Defendant conceded he continued to see Ms. Woods on a friendship basis. Defendant acknowledged that there were two bottles of Skyy Blue malt beverage in the bedroom and bathroom, and he said that the victim drank the alcohol. Defendant said that he later found his nipple ring inside his shirt, and the ring was not the one found in the bathtub after the victim's death.

Dr. Mark Schwartz testified that he is a psychologist, with a doctor of science degree, specializing in sexual and relational therapy. Dr. Schwartz is also a member of the faculty of the St. Louis University's Department of Psychiatry and teaches a course in sexual medicine. Dr. Schwartz's specialty has been in the areas of sexual trauma, sexual deviation, and sexual offenders. Dr. Schwartz defined erotic asphyxiation as the limiting of oxygen to the brain during orgasm. The activity decreases dopamine, increases the endorphin, and enhances sexual arousal. Like most addictions, participants develop a tolerance level which leads to increased risk taking and increased risk of death or an accident. Participants also engage in the activity with increased frequency.

Dr. Schwartz said that he met with Defendant for two and one-half hours the night before the trial. He stated that the use of the forearm to increase pressure on the partner's throat was an effective form of erotic asphyxiation. Dr. Schwartz said that a distinguishing feature of a crime scene involving erotic asphyxiation as opposed to suicide or homicide by strangulation was the presence of ligatures or sexual devices such as dildos and whips. Dr. Schwartz said that participants in the activity were almost always involved in other excitement inducing activities such as riding

- 15 -

motorcycles or deviant sexual activities such as swingers clubs. Body piercing was also common among participants of erotic asphyxiation.

Dr. Schwartz said that Defendant's explanation of the use of hand signals to control the application and release of pressure around the neck supported his credibility because someone who had not engaged in erotic asphyxiation would not grasp the significance of anticipating a signal for release. Dr. Schwartz explained that the problem with the system described by Defendant was that the partner waits longer and longer before signaling release, and it was a "lethal kind of system that they used."

Dr. Schwartz stated that as a result of his interview with Defendant and review of the material which had been introduced into evidence, it was his opinion that the victim's death was an accident due to erotic asphyxiation.

On cross-examination, Dr. Schwartz verified that he was not a medical doctor.

*Vern Braswell*, 2008 WL 238014, at *1-11.

## Post-Conviction Proceedings

The Petitioner filed a pro se petition for post-conviction relief in which he claimed that trial counsel was ineffective at trial and that the prosecution engaged in multiple acts of prosecutorial misconduct, including the failure to disclose favorable evidence to the defense. The post-conviction court appointed attorney Ms. Taylor Eskridge to represent the Petitioner, and Ms. Eskridge filed an amended petition in August 2009. In March 2011, Assistant Attorney General Doug Carriker filed a response to the petition, and an evidentiary hearing was scheduled for July 2011.

During an April 20, 2011 report date, Ms. Eskridge requested that the evidentiary hearing be continued. During a bench conference, the following exchange occurred:

GENERAL CARRIKER: I need to sit down with [Assistant Attorney General Glen] Baity and review with him, regarding what he wants her to get from me. There is some of this stuff that I am not comfortable just handing over in Court, so I'll need someone else to review it, too. And that is partly because [District Attorney General Amy] Weirich had things marked as, "not exculpatory," in bold letters in an envelope and it is sealed.

- 16 -

And I want to make sure that before I hand something over that I am not going to—

THE COURT: Oh, my gosh.

MS. ESKRIDGE: Now of course, that wets my appetite, I'm like, what's in the envelope?

THE COURT: For all I know you can file a freedom of information act request for all of that.

GENERAL CARRIKER: And [General] Baity has called me this morning, called me in to make an open file discovery, but I want to meet with him and sit down and show him what he's requesting that we—but, we did find a couple of things that he had questioned the day we met and I want to show him what—to make sure I'm doing the right thing and not getting myself in trouble with the State, whatsoever.

General Carriker also stated that he needed time to review the file and locate additional items requested by the Petitioner. The post-conviction court agreed to continue the evidentiary hearing.

During a report date on July 1, 2011, General Carriker informed the post-conviction court that he still needed to meet with General Weirich, explaining, "I've got to meet with her and let her review it, she was the trial lawyer and I want to get with her before I turn over things that she says I shouldn't be turning over." On July 28, 2011, the post-conviction court entered an order allowing Ms. Eskridge to withdraw as counsel for the Petitioner and for current post-conviction counsel to be substituted as attorney of record.

During a February 13, 2013 report date, post-conviction counsel reported to the post-conviction court that counsel and Assistant Attorney General Marques Young, the prosecutor who had since been assigned the case, met and determined that General Young needed to speak with General Carriker, the prosecutor on the case "two prosecutors ago," to obtain "the full story on who has dealt with this and what's going on in the case." The Petitioner filed an amended petition on August 2013. The Petitioner raised additional claims of ineffective assistance of counsel and that "[t]he State failed to produce exculpatory evidence in this matter. Since such failure to produce, the evidence has not been able to be located."

- 17 -

During a bench conference at a report date on October 11, 2013, post-conviction counsel discussed "an envelope that had a sticky writing on the front of it that said, something along the lines of, what [Ms. Eskridge] remembered it saying was, 'Do not turn over to defense counsel.'" Post-conviction counsel reported that she and General Young reviewed the State's file and were unable to locate the envelope. Post-conviction counsel stated that General Young and General Carriker then searched the file and found something that might be the item for which they were searching but that the item appeared different from what both General Carriker and Ms. Eskridge recalled. While the post-conviction court stated that it recalled the discussion of the item, the court could not recall whether an order was ever entered requiring the State to turn the item over to the Petitioner and suggested that the parties review the filings.

Evidentiary hearings were held throughout 2014, 2015, and 2016. During this time period, the Petitioner filed multiple amended petitions raising additional claims of ineffective assistance of counsel and prosecutorial misconduct due to the State's failure to provide as exculpatory evidence the items from the sealed envelope, statements from witnesses, and other documents.

**The Petitioner's Proof**

General Carriker testified that he was a prosecutor in the post-conviction court's courtroom in 2011 and was assigned to the Petitioner's post-conviction case by the division leader, Assistant District Attorney General Glen Baity, in February 2011. Upon receiving the case, he spoke to Ms. Eskridge and learned that none of the prosecutors who had previously been assigned the case had filed a response to the post-conviction petition or allowed her to see the State's file. General Carriker subsequently filed a response to the Petitioner's petition.

General Carriker met with Ms. Eskridge on two occasions as his office. He and Ms. Eskridge spent the first meeting determining the progress of the case and the tasks that needed to be completed. During the second meeting on April 4, 2011, they reviewed the State's files, which consisted of two large accordion files. General Carriker said he allowed Ms. Eskridge to engage in "open file discovery" and to make notes and copies of anything in the State's file that she wanted. During the meeting, General Carriker located a sealed manila envelope in the file. He estimated that the envelope was approximately one-half of an inch thick and appeared to have contained somewhere between one and one hundred pages. He recalled that on the outside of the manila envelope was a four-inch by four-inch "yellow sticky pad note" with language similar to "not turned over or do not turn over to defense." The note was dated "2005 or so" and had the initials of District Attorney General Amy Weirich, the prosecutor at the Petitioner's trial. Ms.

- 18 -

Eskridge asked to look inside the envelope, and General Carriker told her that he would prefer to obtain permission from his superiors first.

General Carriker testified that he learned shortly after Thanksgiving of 2011 that he was being transferred to the domestic violence unit effective January 2012, and he was instructed that all of his cases would be reassigned to other prosecutors. The Petitioner's post-conviction case was reassigned to Assistant District Attorney General Melanie Headley Cox, and General Carriker gave General Cox the State's file sometime during the first or second week of December 2011.

General Carriker testified that he never unsealed the envelope and never looked inside it. He explained that he did not want to open the seal until he had a chance to speak to someone about it. He did not recall ever giving the envelope to Ms. Eskridge for her review. He said that he kept the State's file in his office while he was assigned the case and did not recall removing the envelope from the file. He did not know whether the envelope was still in the State's file upon his transfer. Ms. Eskridge later withdrew as counsel for the Petitioner.

General Carriker recalled that Assistant District Attorney General Betsy Carnesale Wiseman, who was one of the prosecutors at trial, was his division leader prior to General Baity. General Carriker said that while he recalled speaking to General Wiseman about the case, he did not recall whether he had the envelope with him or whether they had a chance to look at the envelope. He also did not recall reviewing the State's file with her.

Following his transfer, General Carriker did not hear anything else about the envelope until he was approached by either post-conviction counsel or Assistant District Attorney Marques Young and informed that the envelope could not be located. General Carriker went to General Young's office and searched the State's file but was unable to locate the envelope. Instead, he found an open-faced file folder, which he described as a lighter "beige" color than the manila envelope. He stated that the sealed manila envelope was standard-sized for letter-sized paper, while the folder was a legal-sized file. He also stated that the sealed manila envelope was

> a fold top, and it was the type that has a metal prong that starts like this and when you close it, and wrap the thing over it, you pull the prong down and it closes and you can also, usually it has some kind of adhesive on the back that you can lick or use a wet sponge and close it and it will seal.

Inside the file folder was about thirty or forty pages attached with a binder clip and a four-inch by four-inch yellow note. General Carriker testified that he "couldn't say it's

not the same note, but it's very similar as far as what it says on it." The note stated in black ink:

I am NOT giving these items in discovery.

8-22-05
APW

In smaller lettering in blue ink, the note stated:

12-6-05
Jencks STMTS of witnesses who testified were turned over at the appropriate time.

We note that the trial occurred on December 5-9, 2005.

The note, the file folder, and the contents were entered an Exhibit 6 to the post-conviction hearing ("Exhibit 6"). The contents of Exhibit 6 included: (1) the statement of Mr. Billy M. Massey of the City of Memphis Fire Department on December 14, 2004; (2) Ms. Renee Welch's statement on November 18, 2004; (3) documents labeled "Braswell's Burglar Alarm Information"; (4) the victim's employment and medical information from the victim's employer; (5) an authorization for release of the victim's medical, employment, and financial records signed by the Petitioner; (6) a handwritten journal entry dated November 29, 2002, on stationary from Comfort Suites in Grand Prairie, Texas; (7) a typewritten letter from the victim to the Petitioner dated March 24, 2004; and (8) a typewritten letter from the Petitioner to the victim. Handwritten in the bottom right-hand corner of items (6), (7), and (8) was "11/19/04 PW 10:47 AM," and the evidence presented at the evidentiary hearing established that the initials were those of the victim's mother, Pauline Washburn.

On cross-examination, General Carriker testified that the pages in Exhibit 6 were "close to the thickness" to the manila envelope but that it "[c]ould have been more, could have been a little less, I really don't know." He stated that the wording on the note in Exhibit 6 was "very similar" to the wording on the note from the manila envelope. He explained that "the main part of the wording is that I am not giving these items in discovery and then at the bottom [are] initials and the date. I remember that, it's very similar, I can't say more than that, though."

On redirect examination, General Carriker acknowledged that he was not certain that the note on the manila envelope was the same note in Exhibit 6. He stated that as far as he knew, the manila envelope was in the file the last time that he possessed it. He did

not know what happened to the manila envelope after he was transferred out of the division. He testified that he "[d]idn't see [the manila envelope] today, didn't see it last fall when I was made aware of it … not being there."

Ms. Taylor Eskridge was appointed in 2009 to represent the Petitioner in the post-conviction proceedings. She filed a motion for discovery and inspection of the State's evidence in March 2009 and attempted to review the State's file for more than one year without success. She stated that she was told that no one knew where the file was and was provided different reasons why she could not have access to the file. At one point, Assistant Attorney General Brian Davis, who was previously assigned the post-conviction case, informed Ms. Eskridge that the State's file was in California.

After General Carriker was assigned the case, Ms. Eskridge met with him and reviewed the State's file. Ms. Eskridge testified that while reviewing the file, they discovered a letter-sized envelope with a fold over the top that was sealed. She believed the envelope also had a prong for closing the envelope but said "it wasn't prong closed, it was closed with a seal that I recall." She recalled a note on the envelope that said "do not show defense or something like that. But it was something that caught both of our attentions." She stated that the note had "just a few words. It was written in big bold like a marker or something but it was on a post it note stuck to the front of it. But it was something that made us realize that it wasn't something that defense counsel was supposed to see." Ms. Eskridge believed the note included someone's initials or signature but could not remember. She could not recall the words on the note and said "it was something that was not usual. It wasn't like, it's not discoverable or not…, it was something that we hadn't seen before and so it made us both pause." She did not recall whether the writing was in blue or black ink or any other pen markings or other writing on the note.

Ms. Eskridge testified that General Carriker informed her that he should obtain authorization before showing the information in the envelope to her. She never received the information that was inside the envelope and never saw the envelope again. She said she and the Petitioner discussed the envelope on several occasions. Ms. Eskridge later withdrew as counsel, and post-conviction counsel was substituted as attorney of record.

Ms. Eskridge testified that Exhibit 6 did not include the envelope or the note that she saw while she and General Carriker were reviewing the State's file. She explained that unlike the note in Exhibit 6, the note that she saw did not include the language, "I am not giving these items in discovery." She said that although she could not recall the exact words on the note, "it was something shocking." She also said that the note in Exhibit 6 implied that the folder included *Jencks* material, which would not have been discoverable

prior to trial but would have been provided to the defense when the witness testified at trial and to post-conviction counsel during post-conviction proceedings.

On cross-examination, Ms. Eskridge testified that although she could not recall the exact words on the note that she saw during her meeting with General Carriker, the note in Exhibit 6 was not the same note. She said the language on the note that she saw during the meeting was unusual and that it alarmed both her and General Carriker. Ms. Eskridge stated that the note she saw during the meeting "implied that the defense should never see it" and made General Carriker understand that he should not open the manila envelope in front of her and should obtain approval before showing her the contents of the envelope. Ms. Eskridge stated that the note in Exhibit 6, however, did not say that the defense could never see the contents of the folder but that the material was not being provided in discovery. She believed that had she and General Carriker seen the note in Exhibit 6, General Carriker would have provided her with the material in the manila envelope because the note stated that the material had already been provided to the defense at the appropriate time.

Ms. Eskridge testified that she and General Carriker informed the post-conviction court that General Carriker planned to seek approval and then allow her to view the contents of the envelope. Ms. Eskridge stated that she would have filed a motion regarding the material had General Carriker indicated that he did not intend to comply with her request. She said she "was willing to, as a colleague, give him the amount of time that he requested to get it done."

On redirect examination, Ms. Eskridge testified that General Carriker appeared to be "uncomfortable" and "in shock" upon seeing the note. She informed post-conviction counsel about the envelope once post-conviction counsel began representing the Petitioner. While Ms. Eskridge acknowledged that she was unsure of the exact words on the note that she saw during the meeting, she was "sure" that the note in Exhibit 6 was not the same note and that Exhibit 6 did not include the manila envelope.

Assistant District Attorney General Melanie Cox testified that she represented the State in the Petitioner's post-conviction case while assigned to the post-conviction court's courtroom from January 2012 until August 2012. General Cox did not review the State's file to a great extent while the case was assigned to her and never came across a sealed manila envelope with a note stating, "Do not show defense."

On cross-examination, General Cox testified that prosecutors, generally, did not take any action on a post-conviction case until the case was set for a hearing. When she was assigned the Petitioner's case, it was reset on multiple occasions, and as a result, she never really looked at the file. She said neither General Carriker nor a defense attorney

told her there was any problem with the case. General Cox did not recall speaking to Ms. Eskridge about the case and stated that post-conviction counsel was representing the Petitioner when General Cox was assigned the case.

Trial counsel served as lead counsel at the Petitioner's trial, and his father served as co-counsel. Trial counsel had previously represented the Petitioner and knew him outside of the legal system. Mr. Glen Wright represented the Petitioner during the initial appearance and the arraignment in general sessions court, and Mr. Leslie Ballin and trial counsel represented the Petitioner during the preliminary hearing. Trial counsel testified that the defense theory at trial was that the Petitioner and the victim had engaged in erotic asphyxiation on the night of the victim's death, that the victim died sometime later, and that her death was not intentional.

Trial counsel testified that the Petitioner initially maintained that the victim must have drowned and that she was stuck in the Jacuzzi. Trial counsel initially looked at the possibility that the victim drowned. He said that he later learned that following the Petitioner's arrest, the Petitioner informed Mr. Wright that he had engaged in erotic asphyxiation with the victim, but trial counsel maintained that the Petitioner, initially, did not share this information with him.

Dr. Joye Carter, the State's forensic pathologist, concluded that the victim died as the result of manual strangulation, and trial counsel noted that the victim had markings around her neck. Trial counsel testified that throughout the preliminary hearing and the trial, Dr. Carter was "overtly defensive" and had "very strong feelings" which he considered "abnormal" for a physician. Trial counsel contacted Dr. Carter in preparing his case, but Dr. Carter stopped talking to him once she realized that he was questioning her conclusions. Trial counsel then spoke to Dr. O.C. Smith, Dr. Karen Chancellor, Dr. George Nichols, and Dr. Todd Brooks about the case.

Trial counsel testified that in order to obtain an objective view of the autopsy and to either support or exclude the Petitioner's claim that the victim must have drowned, trial counsel hired Dr. George Nichols, a forensic pathologist, to review the medical examiner's report. Trial counsel wanted an independent pathologist outside Memphis who had not necessarily worked with the attorney general's office. Trial counsel did not inform Dr. Nichols of the theory of defense. Trial counsel said he did not retain Dr. Nichols as a "fact witness" and did not want to turn over Dr. Nichols's report to the State if it included information that was helpful to the prosecution. Rather, trial counsel stated his hiring of Dr. Nichols "was part of work product so that [h]e could get an objective view of this autopsy."

Trial counsel did not believe he only sent Dr. Nichols the autopsy report and the photographs but believed he sent Dr. Nichols everything in his possession that related to the crime scene and the autopsy, including trial counsel's typewritten notes from his conversations with Dr. Smith and Dr. Brooks. While trial counsel acknowledged that crime scene photographs and evidence of sexual activity would have been important to a forensic pathologist in reviewing whether a death involved erotic asphyxiation, trial counsel stated that he was not yet pursuing erotic asphyxiation as a theory of defense when he retained Dr. Nichols. Trial counsel did not believe he sent the transcript of the preliminary hearing to Dr. Nichols and explained that he wanted an objective view of what Dr. Nichols saw and without anything to influence Dr. Nichols's observations.

Dr. Nichols informed trial counsel that he did not believe that the victim drowned but that she died due to strangulation. Trial counsel did not recall whether he discussed with Dr. Nichols the possibility that there was a delay between the strangulation and the victim's death or whether he followed up with Dr. Nichols once he began focusing upon erotic asphyxiation as a defense theory. Trial counsel testified that had he done so and had Dr. Nichols concluded that erotic asphyxiation was possible, trial counsel likely would have presented Dr. Nichols as a witness at trial.

Trial counsel denied that he failed to pay Dr. Nichols for his services. Trial counsel was certain that Dr. Nichols's fee was paid up front with a check from the law firm's bank account, and trial counsel believed that Dr. Nichols would not have begun reviewing the materials without receiving his fee.

Trial counsel testified that because Dr. Carter, Dr. Nichols, and Dr. Chancellor all concluded that the victim did not drown, trial counsel decided against presenting a defense of accidental drowning at trial. Each physician with whom trial counsel spoke stated that the amount of water in the lungs was insufficient to cause suffocation. Trial counsel believed that most of the physicians with whom he consulted thought that the water was taken in the lungs post-mortem. Trial counsel recalled that based on the physical evidence from the dissection of the victim's neck, each physician concluded that the victim was strangled to the point that it resulted in loss of consciousness and death.

Trial counsel testified that erotic asphyxiation was chosen as a line of defense despite the existence of evidence that refuted the defense because it was the most plausible line of defense and would result in some witnesses not being called at trial whose testimony would have resulted in a first degree murder conviction. Trial counsel stated that once he began looking at erotic asphyxiation as a defense, he consulted with Dr. Smith from whom he had previously sought advice in medical malpractice cases. Trial counsel explained that he did not receive a report from Dr. Smith because he utilized Dr. Smith to "bounc[e] off" ideas.

Trial counsel contacted Dr. Chancellor, who worked in the Shelby County Medical Examiner's Office and who had approved Dr. Carter's autopsy, two weeks to one month prior to trial and asked her to review the materials. Trial counsel stated that based on his experience with Dr. Chancellor, he knew that Dr. Chancellor would be "straight up" with him and was not "pro prosecutor." When trial counsel contacted Dr. Chancellor, he believed that Dr. Chancellor would be testifying for the State at trial because Dr. Carter had since left the medical examiner's office. Trial counsel later learned that the State had subpoenaed Dr. Carter to testify at the trial. Trial counsel asked Dr. Chancellor to attend trial to refute some of Dr. Carter's testimony. During a break in the trial, Dr. Chancellor informed trial counsel and co-counsel that she would testify that the Petitioner would have had to have choked the victim for at least five minutes after the victim lost consciousness and explained the basis for her opinion. As a result, trial counsel did not call Dr. Chancellor as a witness. Trial counsel said that Dr. Chancellor did not inform him of this conclusion prior to trial and that had Dr. Chancellor presented such testimony at trial, it would have caused the defense to "implode."

Trial counsel acknowledged that while Dr. Carter testified during the preliminary hearing that a person could have a delayed reaction from the pooling of blood following strangulation, Dr. Carter also testified that a delayed reaction did not occur in this case. Dr. Carter also testified during the preliminary hearing that although she was unable to scientifically conclude that the victim's death was contemporaneous to the strangulation, she opined that the victim's death was, in fact, contemporaneous to the strangulation. Trial counsel did not recall whether he asked any of the physicians with whom he consulted whether there was a delay between the strangulation and the victim's death. He said that if he had any evidence that the victim was able to get out of bed after engaging in erotic asphyxiation but died minutes later due to erotic asphyxiation, he would have presented it. However, he said that "everything I had did not indicate that."

Trial counsel testified that he believed the victim died in the Jacuzzi bathtub, which was consistent with the majority of the Petitioner's version of the events. Trial counsel noted that a great amount of water was on the floor and that some of the water could have come from the Petitioner and the paramedics pulling the victim out of the Jacuzzi. Trial counsel also noted that some physical evidence suggested that the victim was in the Jacuzzi at least at the point of death, if not prior to her death.

Trial counsel and co-counsel formed a strategy for cross-examining Dr. Carter at trial. Trial counsel believed that Dr. Carter went "out of her way to be a State's witness." He recalled that Dr. Carter was "erratic" and "defensive" at the preliminary hearing. She denied having any photographs with her even though trial counsel saw the photographs. She made other statements that trial counsel knew were false. Trial counsel obtained information about accusations of misconduct or misbehavior on the part of Dr. Carter that

fell below the standards of practice in the field of forensic pathology. Trial counsel noted that in Washington, D.C., Dr. Carter was accused of allowing bodies that had not yet been autopsied to be stacked on top of each other so that any evidence obtained from those bodies could be considered tainted. Some people refused to work with Dr. Carter due to her erratic behavior and volatile attitude. Trial counsel followed cases where Dr. Carter had been accused of manufacturing evidence. Two whistleblower lawsuits were brought in Harris County, Texas due to Dr. Carter's actions. Trial counsel recalled that during the preliminary hearing, Dr. Carter denied any disciplinary issues in Harris County.

Trial counsel acknowledged that when the issue of Dr. Carter's prior misconduct arose at trial, he informed the trial court that he did not intend to use that information at that time. Trial counsel explained that he and co-counsel knew that the trial court would accept Dr. Carter as an expert regardless of the allegations and believed that the trial court would not allow them to question her about the information on the front end. Trial counsel noted that none of the allegations of misconduct were directly related to the Petitioner's case. Rather, trial counsel stated that co-counsel, who conducted the cross-examination of Dr. Carter at trial, believed the better approach was to question Dr. Carter to the point that she would open the door to questioning about her prior misconduct. Trial counsel stated that they also wanted the jury to see how erratic Dr. Carter was and that they decided to ask questions to make her feel comfortable at first and then "go at her real hard" in order to get her "off balance."

Trial counsel testified that he intended for the Petitioner to be the only person to testify at trial regarding his relationship with the victim. Trial counsel explained that the Petitioner was the only person who had firsthand knowledge of the relationship and that the prosecutors would find it difficult to cross-examine the Petitioner regarding the relationship. Trial counsel stated that the Petitioner was the only person who could explain his side of the story without objection and say what did or did not occur in the bedroom. Trial counsel noted that the Petitioner was an intelligent man who had a master's degree and was an administrator in the school system and that he was capable of articulating to the jury what was involved in his relationship with the victim. Trial counsel found demonstrative evidence in the form of sex toys amongst the Braswells' personal belongings to corroborate the Petitioner's testimony.

While trial counsel recalled the Petitioner informing him of a woman with whom he was involved in an open relationship, trial counsel stated that the Petitioner never told him about Ms. Monique Lane and that trial counsel never interviewed Ms. Lane. Trial counsel did not recall the Petitioner telling him about his involvement with another woman with whom he engaged in choking. Trial counsel stated Ms. Kristie Woods was the only other person of whom he was aware who could corroborate the Petitioner's

statements that he engaged in rough sexual activity and choking. Trial counsel acknowledged that someone such as Ms. Lane who had observed the victim engaging in erotic asphyxiation would have been an important witness and would have corroborated the Petitioner's testimony. Trial counsel also acknowledged that had he possessed the information about Ms. Lane prior to trial, he likely would have called her as a witness at trial.

Trial counsel did not recall the Petitioner informing him that Mr. Dennis Small, a security guard at a strip club, saw the victim with another woman at the club. The Petitioner informed trial counsel that he and the victim frequented strip clubs, and someone who was familiar with the Petitioner told trial counsel that he or she believed that the Petitioner was involved in an open relationship. Trial counsel stated that this information was contrary to the victim's behavior when she learned that the Petitioner had a mistress but was consistent with the information that the Petitioner had provided him. As a result, trial counsel followed up on the information. Trial counsel spoke to a former police officer who owned a "swingers" club and informed him about the Treehouse, a "swingers club" frequented by the Petitioner. The club subsequently closed, and trial counsel lost contact with the man.

Trial counsel testified that he actively communicated with the Petitioner's sister, Ms. Cheryl Wallace, throughout the case. Trial counsel stated that while Ms. Wallace and the Petitioner's mother were helpful, they were also confused and angry because they loved the victim and wanted to know what happened to her. Trial counsel said that because the Petitioner needed their continued support, trial counsel did not want to push them to a point where they would no longer support the Petitioner. Trial counsel acknowledged that Ms. Wallace told him that the Petitioner and the victim engaged in a "somewhat kinky sexual lifestyle" and that the victim would have done anything to please the Petitioner. Trial counsel stated that Ms. Wallace was unable to provide information from a first person standpoint because she did not witness any of the acts. The Petitioner told trial counsel that some of the sex toys that he and the victim used were stored with his furniture, and Ms. Wallace took trial counsel to a storage unit where trial counsel located the sex toys.

Trial counsel recalled that during opening statements, the defense discussed an intention to show a history of erotic asphyxiation. He denied that he planned to show the pattern through Ms. Woods even though he was aware that Ms. Woods acknowledged her participation in rough sexual behavior with the Petitioner. Rather, trial counsel maintained that he planned to show the pattern of erotic asphyxiation through the Petitioner.

Trial counsel testified that Dr. Schwartz was contacted at the "eleventh hour." On the Saturday prior to trial, trial counsel and co-counsel were at co-counsel's home preparing for trial when co-counsel opined that they needed to hire someone who could explain erotic asphyxiation to the jury. Trial counsel believed that having "someone with a lot of letters behind their last name" to testify that the sexual behavior was not abnormal "would take some of the sting out" of evidence of the Petitioner's behavior and would corroborate the Petitioner's testimony. Trial counsel later testified that he did not know whether Dr. Schwartz was contacted within days or a few weeks before trial but that Dr. Schwartz met with the Petitioner shortly before trial. Trial counsel also said co-counsel initially contacted Dr. Schwartz for the purpose of gathering information for trial preparation. Trial counsel and co-counsel wanted Dr. Schwartz to address whether the Braswells' behavior and the use of the various sexual devices were consistent with a defense of erotic asphyxiation. Trial counsel and Dr. Schwartz spoke over the telephone throughout the day for a total of two or three hours during which trial counsel provided him with background information. After Dr. Schwartz indicated that he could possibly be helpful in their defense, trial counsel arranged for Dr. Schwartz to fly to Memphis and meet with the Petitioner.

Trial counsel noted that Dr. Schwartz corroborated the Petitioner's testimony at trial. Dr. Schwartz sought to testify about his conversations with the Petitioner, but the trial court refused to allow the testimony. Trial counsel initially acknowledged that information from witnesses such as Ms. Lane would have had some value to Dr. Schwartz, but he later stated that he did not know whether such information would have been important to Dr. Schwartz.

Trial counsel recalled that the State asserted at trial that the defense of erotic asphyxiation was newly fabricated. The Petitioner did not include any information in his statement to the police that he and the victim had engaged in erotic asphyxiation prior to the victim's death. Trial counsel stated that he presented Mr. Wright's testimony during a jury-out hearing to establish that the Petitioner had mentioned it to Mr. Wright, who had initially represented the Petitioner, following his arrest. Trial counsel did not recall whether the trial court allowed him to present Mr. Wright's testimony before the jury. Trial counsel said that regardless, he did not want to present any additional testimony from Mr. Wright because he did not want the prosecutor to call rebuttal witnesses to establish that the Petitioner did not mention erotic asphyxiation to the paramedics, the police officers, or others to whom he had spoken after the victim's death.

The Petitioner informed trial counsel of instances during which the victim suffered severe cramping to the point of paralysis, and trial counsel was aware of medications that will cause low potassium levels, leading to cramping, light headedness, and the loss of consciousness. Trial counsel was aware of numerous witnesses who corroborated

information that the victim suffered episodes of paralysis in the past due to potassium deficiency and spoke to Dr. Todd Brooks and Dr. O.C. Smith about the effects of the paralysis. Trial counsel also had Dr. Brooks review the victim's toxicology report to determine whether the victim had a substance in her system that could have resulted in paralysis. While trial counsel investigated the possibility that the victim suffered an episode of paralysis, was unable to get out of the Jacuzzi, and lost consciousness, he was unable to discover any evidence to support this theory.

Trial counsel recalled having information about a large amount of hair discovered in the Jacuzzi, but he did not recall Ms. Wallace telling him that Ms. Mikki Jackson found a large amount of hair in the Jacuzzi's suction system while cleaning the Petitioner's home following the victim's death. Trial counsel researched the circulation of water and drainage in Jacuzzis and the pressure asserted from their suction systems. He searched on the internet for civil suits where the manufacturers of the model of Jacuzzi bathtub owned by the Petitioner had been accused of manufacturing a defective product resulting in someone being held underwater. Trial counsel also interviewed two plumbers who installed such devices about the mechanics of the Jacuzzi bathtub, and he obtained a manual from a plumbing company.

Trial counsel stated that while the victim could have "cramped up" or passed out in the Jacuzzi and her hair could have been caught in the suction, he did not have any solid evidence that this occurred. He noted that the suction in the Jacuzzi had a screen over it and that the suction did not have enough force to hold someone who weighed more than twenty-five or thirty pounds under water unless possibly that person was unconscious. Trial counsel "reluctantly" and "very cautiously" agreed that based on his research, the suction was strong enough to hold a 120 to 130-pound, unconscious woman under water if her hair had been caught by the suction.

Trial counsel knew that the Petitioner reported he was unable to remove the victim from the Jacuzzi during the 911 call and that when the paramedics arrived, a portion of the victim's body, including her head, was out of the Jacuzzi. Trial counsel agreed that if the victim's hair had been caught in the Jacuzzi's suction, the Petitioner could have pulled her hair out of her head while trying to pull her out of the Jacuzzi and that evidence of hair found in the Jacuzzi could have corroborated the Petitioner's claim that he was vigorously trying to get the victim out of the Jacuzzi. However, trial counsel stated that evidence of hair found in the Jacuzzi could have suggested that an altercation occurred in the Jacuzzi and that, as a result, he chose not to focus on the hair. He stated that if he had presented a witness at trial to testify about the discovery of the hair, the witness would have had to admit that she did not know how the hair got into the Jacuzzi's suction system and that the hair may have been in the water first and was then sucked into the suction system. Trial counsel stated that he would not have presented such

evidence unless he had other proof to support the claim, such as the paramedics finding her with her hair stuck and the jets running. He could not establish that the suction system caused the victim to be stuck in the Jacuzzi and said that, as a result, he did not believe presenting such an argument would be reasonable. He acknowledged that the Petitioner stated that the victim's hair had been stuck in the suction system. Nevertheless, trial counsel explained that he believed he needed to exercise care to avoid opening the door to the prosecution creating a scenario where the jury would question the Petitioner's veracity.

Trial counsel met with one of the investigating officers and discussed the temperature of the water in the Jacuzzi. Trial counsel recalled that the temperature of the water in the Jacuzzi was in the mid to low 90s. He also recalled the State used evidence of this water temperature and Mr. Darrell Burton's calculations at trial of what the water temperature should have been based on a water heater temperature setting of 120 degrees to argue that the Petitioner added hot water to the Jacuzzi to manipulate the scene and to discredit the Petitioner's statement to the police. Trial counsel said the State basically argued that if the temperature in the Jacuzzi was 90 degrees by the time that the first responders arrived and measured the water's temperature, the temperature of the water would have initially been 167 to 180 degrees and that no one would have been able to sit in such hot water.

Trial counsel acknowledged that Mr. Patrick Taliaferro issued a report stating that the thermostat on the Petitioner's water heater was set at 160 degrees. Trial counsel testified that although he explored the information provided by Mr. Taliaferro and discussed it with the Petitioner, he decided not to "chase that assumption" and make it a large part of the defense. Trial counsel explained that he decided to focus more on presenting an affirmative defense on how the death occurred rather than simply attempting to raise reasonable doubt. Trial counsel acknowledged that evidence that the thermostat on the Petitioner's water heater was set to 160 degrees rather than the 120-degree temperature upon which Mr. Burton based his calculations may have refuted the testimony of Mr. Burton and other witnesses about the water in the Jacuzzi still being warm. Trial counsel did not call Mr. Taliaferro to testify at trial or otherwise contact an expert in hot water heaters, temperature settings, and the speed at which water cools.

While trial counsel believed he objected to Mr. Burton's testimony at trial on the basis that Mr. Burton was not an expert, trial counsel nevertheless stated that Mr. Burton was a fact witness and was never intended to be an expert witness. Trial counsel knew the State's goal in examining Mr. Burton and stated that as long as the prosecutor did not "go too far," trial counsel was not going to object. Trial counsel noted that Mr. Burton's testimony was not long and that the prosecutor made a few points and moved on to the next witness.

- 30 -

Trial counsel did not hire a private investigator to assist him in the case. Rather, he dedicated a great amount of time investigating the case himself. He had prior experience as an investigator on the capital defense team of the Shelby County Public Defender's Office for several years and had tried several first degree murder cases. He also utilized the services of two paralegals and his brother, all of whom had investigation experience, and believed that his office was able to conduct a thorough investigation.

Trial counsel testified that he did not file a motion to have the Petitioner declared indigent because the Petitioner was not indigent. Although the Petitioner was arrested following the victim's death and remained incarcerated throughout the trial, he was able to pay his attorney's fees and other expenses associated with the cost of his defense. Trial counsel understood that the Petitioner's family sold the Petitioner's assets to pay for his defense. Trial counsel said that if the Petitioner had difficulty paying for the defense, trial counsel would have asked the trial court to declare the Petitioner indigent. Trial counsel acknowledged that had the Petitioner been declared indigent, the trial court would have granted funds to retain a private investigator.

Trial counsel filed a motion prior to trial seeking to exclude evidence of bad acts under Tennessee Rule of Evidence 404(b). The trial court originally ruled that the evidence could only be admitted in rebuttal if the defense opened the door. Trial counsel recalled that after the defense informed the trial court of their intention to discuss Dr. Schwartz's conclusions with the jury during voir dire, the trial court changed its ruling to allow the State to present the bad act evidence in its case-in-chief.

Trial counsel did not recall the prosecutor stating in opening statement that the Petitioner "choked women to get his message across" and did not recall whether he objected to the statement. Trial counsel disagreed that the prosecutor argued propensity in the opening statement but believed she "introduced the jury to an idea of propensity. It's a difference." He also believed "her introduction of that material and that testimony was something more to the tune of we anticipate you're going to hear proof down this line." Trial counsel described the prosecutor's statements as a dangerous way to approach the evidence because had the evidence not been presented, he would have argued to the jury that the prosecutor failed to deliver on her promise. Trial counsel explained that he did not object every time that the bad act evidence was mentioned because he did not want to emphasize the evidence to the jury.

Trial counsel testified that the State did not include the victim's 1996 order of protection against the Petitioner in its notice of its intent to present bad act evidence pursuant to Rule 404(b). Trial counsel stated that he was aware of the prior order of protection because he conducted an investigation into the Petitioner's background and had previously represented the Petitioner. Trial counsel did not recall whether he

objected to the admission of the evidence regarding the order of protection but said he believed the trial court erred in admitting the evidence.

Trial counsel recalled that he sought to introduce evidence of the Petitioner's good conduct during his cross-examination of Ms. Woods. The trial court found that trial counsel opened the door to allow the State to question Ms. Woods about the Petitioner's prior bad conduct. Trial counsel disagreed with the trial court's ruling and explained that he was only seeking background information about the Petitioner. He also explained that had he not engaged in such questioning, the jury may not have known that the Petitioner had positive attributes. Trial counsel said he had to make a decision "on his feet" about whether the need to present such evidence outweighed the possibility of opening the door to other acts committed by the Petitioner. He said that while the Petitioner later testified in order to "toot his own horn," trial counsel wanted one of the State's witnesses to "toot [the Petitioner's] horn too."

Trial counsel recalled that the pending divorce filed by the victim was an important part of the State's case and that the victim's mother testified at trial about a check to Mr. Dennis Sossaman, a divorce attorney, that she discovered in the victim's belongings. The Petitioner informed trial counsel that the victim had planned to dismiss the divorce. Trial counsel interviewed Mr. Sossaman, who was unhappy with the Petitioner, and trial counsel did not believe that Mr. Sossaman would be helpful to the defense and decided against calling him as a witness.

Trial counsel was aware that the Petitioner was providing too much information during his telephone calls from jail and warned him about it. Trial counsel said he never spoke to the Petitioner in great detail about the case over the telephone because he knew that the calls were recorded. Trial counsel did not recall anything that he or the Petitioner said during the telephone conversations that damaged the defense. Trial counsel received a summary of thirty-five calls that the Petitioner made while in jail in discovery and stated that the calls between him and the Petitioner were not summarized. Trial counsel did not receive the actual recordings or a transcript of the recordings in discovery. He recalled that when the issue was raised at trial, the trial court stated that trial counsel had access to the tapes, which had been maintained in the evidence room. Trial counsel believed that the most damaging recordings entered into evidence at trial were the Petitioner's telephone conversations with others during which he appeared to refer to Ms. Woods in "code" and discussed whether she had been sent out of town.

Trial counsel noted that the recordings admitted at trial included two telephone conversations between him and the Petitioner. When trial counsel objected to their admission at trial, the prosecutor informed the trial court that inmates had access to a separate line that was not recorded in order to call their attorneys. Trial counsel was

unware that a separate line existed and did not try to locate someone at the jail to refute the existence of this line. Trial counsel stated that he would not have presented such a witness to the jury because he did not want to emphasize the recordings to such a degree that the jury would believe that the recordings were important.

At trial, trial counsel requested *Jencks* material on the record as it related to Ms. Woods and Ms. Vera Cole. He said he did not address any *Jencks* material for any other witnesses on the record because the prosecutors began providing him with *Jencks* material without him requesting it. Trial counsel did not receive the statements of Ms. Sheronda Smith, Ms. Magra Hardin, and Lieutenant Fred Jackson prior to trial. He stated that he received the statements of Ms. Smith and Ms. Hardin as *Jencks* material during the trial and that he believed he also received Mr. Jackson's statement during the trial.

Trial counsel acknowledged that Ms. Smith's statement to the police included favorable information that was material to the preparation of the defense. Ms. Smith informed police officers that the victim told her that she no longer wished to proceed with a divorce and that the Petitioner's abuse of the victim occurred when the Petitioner was on drugs and before he became sober. Ms. Smith also discussed with officers the convention where she saw the Petitioner viewing a display that included various sex-related items, and trial counsel stated that he learned of this information from the Petitioner. Trial counsel testified that while Ms. Smith's statement included information that was favorable to the defense, the favorable information did not outweigh the "real bad facts" that were also included in the statement. Ms. Smith informed officers that the victim did not enjoy engaging in the unconventional sexual acts but was essentially being submissive to the Petitioner. She discussed with officers the discovery of a large amount of hair in the Jacuzzi while she and others were cleaning following the victim's death, which trial counsel stated implied that a struggle may have occurred. Ms. Smith also told officers that following the victim's death, the Petitioner stated that he was missing a nipple ring and left to have it replaced, which could imply that the Petitioner lost the nipple ring during a struggle.

Trial counsel testified that he did not receive Ms. Karen Taylor's statement to police in discovery prior to trial and that because the State did not call her as a witness at trial, he did not receive her statement as *Jencks* material. Trial counsel maintained that he first learned of Ms. Taylor's statement during post-conviction proceedings. He stated that the information included in Ms. Taylor's statement would have been material in his preparation of the defense and acknowledged that Ms. Taylor's statement included information regarding the sexual lifestyle between the Petitioner and the victim, their visiting strip clubs, and the victim's prior episodes of paralysis. Trial counsel noted that Sergeant Merritt specifically asked Ms. Taylor whether the Petitioner and the victim engaged in choking during sex, and Ms. Taylor said, "No." Trial counsel testified that

Ms. Taylor's statement also included information that would have been detrimental to the defense and that as a result, he would not have utilized the statement had he received it in discovery. Trial counsel explained that Ms. Woods and other witnesses gave statements to the police officers because the witnesses believed that the Petitioner intentionally killed the victim and that their statements included information that was damaging to the defense.

Trial counsel did not receive a letter that the Petitioner wrote to the victim or the victim's medical records in discovery. He said he was able to obtain the victim's medical records through his own investigation.

On cross-examination, trial counsel testified that he obtained his law license in 1990 and had tried six or seven first degree murder cases prior to the Petitioner's trial in 2005. In investigating the case, trial counsel utilized the services of multiple investigators, including a licensed investigator and his brother, who was an attorney who had previously been employed as an investigator for the Shelby County Public Defender's Office and the Tennessee Attorney General's Office. Trial counsel interviewed witnesses to determine whether the witness would be cooperative, articulate, and able to withstand rigorous cross-examination.

Trial counsel stated that when he and the Petitioner first met, the Petitioner did not report that he and the victim had engaged in erotic asphyxiation. Rather, the Petitioner insisted that the victim had drowned and that she did not die as a result of manual strangulation. Prior to the preliminary hearing, trial counsel obtained the autopsy report and photographs and reviewed them with Mr. Ballin, after which they agreed that they had been "chasing a phantom."

Trial counsel testified that he retained Dr. Nichols to review the autopsy so that trial counsel could ascertain whether the Petitioner was being truthful in claiming that the victim drowned. Trial counsel testified that based upon his reading of the autopsy report, he knew that the victim did not drown but that he was willing to give the Petitioner the benefit of the doubt. Because the physical evidence did not support the Petitioner's claim that the victim drowned, the defense theory changed and "later morphed into no substantial affirmative defense at all to then reasonable doubt." In light of the Petitioner's statement to the police, trial counsel believed he needed to craft a reasonable defense rather than simply attack the State's proof in an effort to create reasonable doubt. He said the fact that the Petitioner gave a statement to the police and talked to a large number of people about what had occurred on the night of the victim's death limited the possible defense theories because numerous witnesses would be able to impeach the Petitioner's testimony if it was inconsistent with his prior statements.

Trial counsel testified that the Petitioner did not inform him about engaging in erotic asphyxiation with the victim on the night of her death until approximately three weeks before trial. Trial counsel stated that while he and the Petitioner may have discussed erotic asphyxiation a few months before trial, trial counsel did not pursue it as a defense until shortly before trial. Trial counsel already had conversations with Ms. Woods with respect to the Petitioner choking her. Trial counsel said that once he began to discuss the "idea of the sex," the Petitioner stated that he informed Mr. Wright from the beginning of the case that he and the victim had engaged in choking as part of a sexual act on the night of her death. Trial counsel stated that Mr. Wright never shared this information with him. Trial counsel explained that Dr. Schwartz was hired at such a late date because that was the point at which the defense team decided that erotic asphyxiation would be the defense theory at trial.

Trial counsel testified that after the defense changed to erotic asphyxiation, he did not seek to continue the trial because he did not believe that a continuance was necessary or that the trial court would grant a continuance. He also did not want to provide the State with sufficient time to prepare to refute the defense. He noted that the State never asked him about the theory of defense during trial preparation. He had stated during a hearing prior to trial that the theory of defense would be accidental drowning. He did not inform the State that the theory of defense would involve erotic asphyxiation until the first day of trial when he disclosed Dr. Schwartz as an expert. Trial counsel explained that he never informed the State of the theory of defense until he was required to do so. He stated that while the theory of defense may be addressed during settlement negotiations, the State never made a plea offer in the Petitioner's case. He explained that he wanted to address the defense of erotic asphyxiation during voir dire in order to gauge the prospective jurors' reactions.

Trial counsel testified that he attempted to keep the defense narrowly focused in an attempt to avoid a first degree murder conviction. He noted that the Petitioner's story that he and the victim engaged in sex involving manual strangulation after which the Petitioner went to bed was not consistent with the scientific proof. Trial counsel acknowledged that as a result, he had to "tip-toe" through the whole process from the preliminary hearing to the trial.

Trial counsel stated that based on his observations of the jurors when the State presented evidence regarding the temperature settings on hot water heaters, he did not believe that the jury understood the evidence and its purpose. As a result, trial counsel did not want to risk making the prosecutor's point during cross-examination or give the prosecutor a chance to clean up the evidence during redirect examination.

Trial counsel testified that although he was not provided with the statements of witnesses who had given information about the discovery of the hair, he knew the names of those witnesses and had been told by more than one person about the hair. He also observed that the victim was missing hair in the crime scene photographs. Trial counsel went to the Petitioner's home and examined the Jacuzzi. He stated that based on the Petitioner's statement, the hair should have been stuck in the screen of the suction but that it was not. Trial counsel testified that he had "mixed feelings" on how to approach the discovery of the hair in the Jacuzzi by another witness because the witness also found a nipple ring in the Jacuzzi. He knew that the nipple ring belonged to the Petitioner and that witnesses would testify to hearing the Petitioner discuss missing a nipple ring following the victim's death and to the Petitioner's leaving to have the nipple ring replaced. Trial counsel believed he was successful in keeping out that evidence at trial.

Trial counsel determined that the defense had no basis and that the scenario of the Petitioner desperately trying to pull the victim out of the Jacuzzi was not helpful to the defense. Trial counsel explained that the scenario raised questions of why the Petitioner did not simply drain the water from the Jacuzzi and turn off the jets. Moreover, when the paramedics arrived, the upper portion of the victim's body was out of the Jacuzzi. Trial counsel acknowledged that based on Dr. Chancellor's findings, the Petitioner would have had to have continued choking the victim while in the Jacuzzi for five minutes after she lost consciousness, that the victim's hair would have had to have been sucked into the Jacuzzi's jets, and that the Petitioner would have had to have left her there. Trial counsel said he wanted the jury to focus on the fact that the Petitioner and the victim engaged in uncommon sexual behavior and that the victim's death was accidental.

Trial counsel testified that the issue of the victim's paralysis would have been more important had the defense been that the victim drowned in the Jacuzzi and would have resolved the issue of why she was unable to get out of the Jacuzzi. He did not believe that any paralysis prevented the victim from screaming out for the Petitioner, and he stated that the victim did not drown.

Trial counsel acknowledged the State presented witnesses at trial whose statements included information about which trial counsel had previously been aware. The Petitioner identified for trial counsel all those who visited his home following the victim's death and those who attended the convention where he saw the display of sexual items. The State provided him with police supplements in discovery that summarized interviews of various witnesses, including Ms. Taylor, Ms. Renee Welch, and Mr. Brian James. Trial counsel stated that no evidence was presented at trial of which he was unaware but that the trial court admitted some evidence that he did not believe was admissible. He also stated that he was unaware of any other evidence that he would have presented at trial and acknowledged that none of the witnesses admitted in their

statements to being aware of the Braswells' engaging in erotic asphyxiation. Trial counsel did not believe that the State suppressed his access to those who could corroborate the Braswells' sexual lifestyle.

Trial counsel agreed that each witness who had knowledge of the Braswells' sexual lifestyle stated the victim was not a willing participant but was simply complying with the Petitioner's requests. When the State presented those witnesses at trial, trial counsel chose to get them off the stand as quickly as possible in an effort to avoid providing the State with any additional ammunition against the Petitioner. Trial counsel was concerned that testimony from witnesses about what the victim may have told them about her sexual lifestyle would have resulted in jurors thinking, "I don't want this guy out here teaching my children." Trial counsel agreed that the theory behind relying upon the Petitioner to testify about the sexual lifestyle was that the State could not challenge the testimony on the basis that the victim was not a willing participant and was being pushed to engage in the acts by the Petitioner.

Trial counsel testified that while the Petitioner stated that he and the victim had been involved with another woman, trial counsel did not believe that the Petitioner identified the woman or informed him that the episodes involved erotic asphyxiation. Trial counsel stated that, nevertheless, the Petitioner was the only person who could testify as to the events leading to the victim's death and that trial counsel did not want to present additional witnesses and risk another story being told on the victim's behalf. Trial counsel acknowledged that he wanted to present the Petitioner to the jury as a man who in all other aspects of his life was normal and stable but who engaged in unusual sexual acts with his wife. Trial counsel also acknowledged that he wanted the jury to believe that the Petitioner was honest because the Petitioner was confessing to some unpleasant actions and that it would have taken "the wind out of his sails" if trial counsel presented evidence of the Petitioner's sexual lifestyle before the Petitioner testified. Trial counsel noted that he also had demonstrative evidence supporting the Petitioner's testimony of his sexual lifestyle.

Trial counsel recalled that even before the issue of his opening the door to bad act evidence arose during his cross-examination of Ms. Woods, the prosecutor questioned Ms. Woods on direct examination about an incident during which the Petitioner pushed her against a wall and pushed her head on a glass table. Trial counsel learned of other incidents during his investigation that were not presented at trial. He testified that he did not want the jury to believe that the Petitioner was living a double life and that he had to present evidence regarding the Petitioner's community activities and work with children.

Trial counsel met with Ms. Woods on multiple occasions and recalled that Ms. Woods became "somewhat adversarial" as the trial grew closer. She moved to Seattle,

Washington, and then to San Francisco, California. Trial counsel did not believe the State would be able to locate her, but they did so. He learned where she was staying prior to her testimony and met with her. Ms. Woods told trial counsel that she would not lie for the Petitioner, and trial counsel assured her that he did not want her to lie. Trial counsel told Ms. Woods that she did not have to "offer anything" to the State and that she simply needed to answer the questions asked. Ms. Woods affirmed that she could do so. Ms. Woods informed trial counsel that she spoke to the Petitioner before she learned of the victim's death and that the Petitioner asked her whether she was ready to be "number one." Trial counsel stated that he had not been aware of the nature of the telephone conversation and that her revelation "sent us into a complete spiral." Trial counsel did not know whether the prosecutor was aware of this information, and he feared that Ms. Woods would blurt out the information during her testimony. Trial counsel said he attempted to push Ms. Woods in a different direction by asking her about the Petitioner's community involvement. Trial counsel believed that had Ms. Woods testified to the Petitioner's statement during the telephone conversation, it would have resulted in a conviction for first degree murder.

Trial counsel was aware that the victim was accused of having an affair while the Petitioner was enrolled in a rehabilitation program. Trial counsel said that he did not present the evidence at trial because he believed that the evidence would be hearsay, he did not want to demonize the victim, and he did not want to open the door to evidence of all of the victim's good deeds.

On redirect examination, trial counsel testified that the victim died in November 2004, that the preliminary hearing occurred in December 2004, and that the trial occurred in December 2005. When trial counsel approached the prosecutor about a plea agreement, the prosecutor told him that she would need to speak to the victim's family first. Trial counsel said that he was later told that the Petitioner could plead guilty to the offense alleged in the indictment. He also said he knew that the case was going to trial approximately two or three months after the indictment. Trial counsel stated that he generally pushed for a trial date quickly if he knew that the case was going to trial and his client was unable to post bond.

Trial counsel did not recall the Petitioner owing a portion of his fee on the day of trial or trial counsel requesting the Petitioner to make a payment. Trial counsel identified two receipts for $1,500 and $700, respectively, both dated December 9, 2005, the trial date, and noted that the second receipt indicated a balance of $10,800. Trial counsel stated that if a substantial amount was owed, he could see co-counsel requesting a payment. Trial counsel maintained that any outstanding balance would not have affected whether they went to trial or what actions they took at trial. He stated that based on his

representation of the Petitioner in this case and in prior cases, the Petitioner had the means to pay for his defense and, therefore, was not indigent.

Trial counsel explained that while he did not present any evidence at trial to contradict the State's evidence regarding the hot water in the Jacuzzi or the victim's episodes of paralysis, such evidence was irrelevant to the defense. He stated, "The temperature of the water had absolutely one hundred percent (100%) positively nothing to do with whether or not this manual strangulation was an accidental killing that occurred during sex." He said he could not pursue two divergent defenses at trial.

Trial counsel testified that while he had a few issues with the Petitioner's initial explanation to him about the victim's death, trial counsel did not necessarily believe that the Petitioner was lying, and he pursued the information. He noted that the foam in her mouth, her tongue being pushed out, and the broken blood vessels in her eyes could have been indicative of drowning.

When trial counsel visited the Petitioner's home, he measured the distance between the Petitioner's bedroom and the children's bedroom located across the hallway. Trial counsel also noted that the Jacuzzi was located a short distance from the Petitioner's bed and that he did not believe that the door adjoining the Petitioner's bedroom and the bathroom where the Jacuzzi was located was shut. Trial counsel questioned why the victim would not have yelled out for help if, based on the Petitioner's original explanation, the victim suffered an episode of paralysis while in the Jacuzzi.

Trial counsel clarified that the defense of erotic asphyxiation did not arise four months prior to trial but first arose during the month of trial. He affirmed that various people provided him information about the Braswells' sexual lifestyle throughout the course of his investigation but stated that none of the information included erotic asphyxiation.

Trial counsel testified that based on his reading of the jury and his conversations with some jurors following the verdict, he believed that evidence of the Petitioner's prior bad acts swayed the jury into believing that an altercation occurred between the Petitioner and the victim prior to her death. He agreed that any indication that an altercation occurred could have been refuted by evidence of the sexual lifestyle between the Petitioner and the victim.

When questioned on redirect examination regarding whether the prosecutor informed him about the existence of the recordings of the Petitioner's call from the jail and that he could bring the prosecutor a compact disc on which to copy the recordings, trial counsel replied, "Something like that." He explained that he did not provide the

prosecutor with a compact disc because the recordings were on tapes. He stated that while he received Ms. Smith's statement during the trial, he did not recall whether he received the statements of Ms. Hardin or Lieutenant Jackson.

Trial counsel acknowledged that for the most part, he basically convinced the jury that what he said occurred actually did occur and that the victim's death was not an intentional and premeditated act. He said, "We call it a win."

Post-conviction counsel recalled trial counsel during a later hearing after trial counsel contacted her and stated that he needed to clarify his earlier testimony. Trial counsel testified that following his earlier testimony, he discovered in his notes that the Petitioner mentioned Ms. Lane to him as someone who was involved with both the Petitioner and the victim. Trial counsel acknowledged that he did not interview Ms. Lane and did not call her to testify at trial. He maintained that he was not made aware of the recordings of the Petitioner's calls from the jail and that the recordings were not given to him prior to trial.

Trial counsel testified that while he was not dishonest when he testified in prior hearings, he acknowledged that he was "holding back." He explained that in 2014, he learned that the Shelby County District Attorney General's Office was investigating his involvement in a multimillion dollar transaction that occurred in 2012. Before he initially testified during the post-conviction proceedings, he was told that the State was looking into whether he should be indicted. He had to retain counsel as a result of the investigation. While trial counsel believed that he had been cleared of any wrongdoing, he had not yet been told by the prosecutor that he was no longer being investigated.

On cross-examination, trial counsel acknowledged that when he testified previously, he did not feel pressured by the State to testify in a certain manner in order to avoid an indictment. Rather, he explained that he was concerned because his counsel warned him against offering testimony that "would trigger something against him." He denied that he intentionally failed to offer complete testimony during the prior hearing due to the pending investigation. He stated that he would not have testified if he felt that he should not do so and that the pending investigation did not affect his willingness to testify.

Trial counsel acknowledged that during trial, he intentionally limited other witnesses from discussing the Braswells' sexual lifestyle because he did not want the jury to hear on a repeated basis from others about what might be characterized as unusual sexual activity. Trial counsel confirmed that he also wanted to avoid such repeated testimony to prevent the jurors from having a picture of the Petitioner in their minds before he testified. When trial counsel was asked, "So it really wouldn't have made any

difference what [Ms. Lane] said in the interview because she would have been somebody who would have been testifying to that type of behavior?" trial counsel responded, "I guess that's correct. I did not interview [Ms. Lane]."

Trial counsel testified that he was unaware of the recordings of the Petitioner's calls from the jail and did not mention them in his notes, which he stated meant that he never saw them. He clarified that his testimony was not that he never received the summaries of the calls and if the calls were summarized, "it had to have been overlooked because we were surprised by the content of the jail phone calls." Trial counsel stated that neither he nor co-counsel recalled receiving the recordings and that he believed he was "ambushed" by the State at trial. He also stated that although he believed that the trial court's ruling regarding the recordings was incorrect, he did not continue to object in front of the jury because he did not want the jury to think that the recordings were important.

On redirect examination, trial counsel testified that the night before trial began, he and co-counsel decided that co-counsel should give the opening statement. Trial counsel explained that they wanted to "put a little gray hair up front because of the nature of the case." Trial counsel believed the jury "would be a little more settled" hearing about the defense from someone who was older than trial counsel.

Mr. Glen Wright testified that in 2004, the Petitioner contacted him and his then-partner, Mr. Jerry Stokes, to represent him. Mr. Wright said the Petitioner indicated that the victim had possibly fallen asleep in the Jacuzzi, resulting in her death. Mr. Wright believed that the Petitioner indicated that the victim had fallen asleep in the Jacuzzi on a prior occasion and almost drowned.

Mr. Wright testified that he met the Petitioner during a second time in the Homicide Office of the Memphis Police Department. The Petitioner informed Mr. Wright that he and the victim engaged in "rough sex" where he placed his arm across her throat, causing suffocation. The Petitioner asked Mr. Wright whether he should give another statement to the police and include that information, and Mr. Wright said he likely advised the Petitioner against giving the statement. Mr. Wright recalled that he was called to testify at trial to contradict the State's claim that the Petitioner's defense was recently fabricated, but he did not believe that he testified in front of the jury.

Mr. Wright testified that he had never heard of a secure telephone line at the jail where defendants could contact their attorneys. He said he generally advised clients against discussing their case on the telephones at the jail because he understood that the calls were being recorded. He did not want his clients to divulge any confidential information over the telephone.

- 41 -

On cross-examination, Mr. Wright testified that he did not recall the Petitioner stating that the victim died while they were engaging in rough sex. Mr. Wright could not recall the specifics of the conversation other than the Petitioner stating they were engaging in rough sex, which led to the victim's death.

Mr. Leslie Ballin, a criminal defense attorney, was retained in 2004 to represent the Petitioner around the time of the victim's death and during the preliminary stages of the case. Mr. Ballin testified that shortly after the victim's death, he and the Petitioner discussed how the victim's death was unintentional and that it occurred during sex. Mr. Ballin did not recall whether any other attorney worked with him on the Petitioner's case during the preliminary hearing.

Mr. Ballin testified that during his thirty-seven years of practicing law, he had never heard of a secure telephone line at the jail where his clients could contact him. He stated that whenever a client called him from the jail, they would only discuss procedural matters and that he would instruct his client to refrain from discussing factual matters because the telephone line was not secure and the discussion could be used against his client.

District Attorney General Amy Weirich testified that she and General Wiseman were the prosecutors during the Petitioner's trial in December 2005. General Weirich prepared the discovery once trial counsel filed a motion, and trial counsel was contacted to retrieve the discovery from the District Attorney General's Office on August 23, 2005. General Weirich noted that trial counsel was given a summary of the recordings of the Petitioner's telephone calls from the jail and, therefore, was aware of their existence.

General Weirich testified that she recognized Exhibit 6 and that the note on Exhibit 6 was in her handwriting. She did not recall sealing any discovery in a manila envelope and writing a note that no one should give the information to the defense. She stated that her general practice was to place those items that were not turned over to defense counsel in a folder and to label the folder as "[i]tems not turned over," similar to the folder in Exhibit 6. She recalled that General Carriker asked her about an envelope while he was preparing for the Petitioner's post-conviction hearing. She told him that she had no knowledge of an envelope and that she had not touched the file on the Petitioner's case since the December 2005 trial.

General Weirich acknowledged that she did not provide trial counsel with a handwritten statement on Comfort Suites letterhead dated November 29, 2009, a typewritten letter to the Petitioner from the victim, and a typewritten letter to the victim from the Petitioner that were included in Exhibit 6. The bottom corner of each letter included information indicating that Ms. Pauline Washburn, the victim's mother, turned

the documents over on November 19, 2004. General Weirich stated that while the documents were not given directly to her, they "made it into our file." She did not know where Ms. Washburn found the documents. General Weirich acknowledged that if the items were retrieved from the Petitioner's home or his belongings, she possibly would have been required to provide them to trial counsel in discovery in accordance with Tennessee Rule of Criminal Procedure 16. When post-conviction counsel asked whether the Petitioner's typewritten letter could constitute a statement of the Petitioner, General Weirich replied, "I guess, but not under Rule 16." She explained, "It's not a statement that fell under Rule 16, and I didn't provide it. There was nothing exculpatory in it." When asked whether a defendant's statement had to include exculpatory information to be discoverable, General Weirich replied, "I don't know that it is his statement." She acknowledged that "I guess you could say" that a defendant's statement need not include exculpatory information to be discoverable.

General Weirich did not recall whether trial counsel requested *Jencks* material after every witness who testified at trial but said she might have provided the statements regardless of whether trial counsel requested it. She did not know whether she provided *Jencks* material after every witness who had given a statement testified. She noted that while the defense attorney will generally ask for a break to review *Jencks* material, the fact that a break was not indicated in the record did not necessarily mean that she did not provide *Jencks* material.

General Weirich noted that an evidence receipt that was provided to trial counsel in discovery indicated that the State had possession of a recorded statement by Ms. Smith. General Weirich stated that she likely would not have given trial counsel both the recorded statement and the formal written statement as *Jencks* material because it would be easier for trial counsel to read the written statement than to locate equipment to listen to the recording.

General Weirich acknowledged that Ms. Smith's statement included information about what the Petitioner told her occurred on the night of the victim's death and that parts of Ms. Smith's statement were consistent with the Petitioner's statement to the police. Ms. Smith also indicated that the victim told her that the victim no longer wished to pursue a divorce against the Petitioner. General Weirich acknowledged that the State presented evidence of the pending divorce at trial in painting a picture of a tumultuous relationship. When asked whether information that the victim no longer wished to pursue the divorce would have contradicted some of the State's proof at trial, General Weirich replied, "I wouldn't necessarily interpret it that way, but I guess that's one way to characterize it." She explained that a tumultuous relationship could exist irrespective of a divorce but acknowledged that "[p]erhaps" the information could have been valuable from a defense standpoint to rebut the State's proof.

- 43 -

General Weirich stated that Ms. Smith also spoke to the police about her knowledge of the Braswells' sexual lifestyle. General Weirich acknowledged that information about their sexual lifestyle could have been important in the context of what occurred prior to the victim's death "if you believed [the Petitioner's] statement." She testified, however, that she believed that the defense at trial would be accidental drowning based on the Petitioner's statement to the police and her conversations with trial counsel in preparing for trial. She did not learn that the defense would be erotic asphyxiation until trial counsel informed her immediately prior to trial.

General Weirich stated that Ms. Smith informed the police of the victim's prior episode of cramping after sex and getting into the Jacuzzi to alleviate the cramping, which General Weirich acknowledged was similar to the events on the night of the victim's death as described by the Petitioner to the police. General Weirich did not agree that Ms. Smith's statement about the sequence of events corroborated the Petitioner's statement to the police and testified, "I didn't believe [the Petitioner's] statement. That was part of our case in chief. That was our theory of the case." She noted that she provided the defense with the police supplemental report in discovery that summarized Ms. Smith's statement in which she described the Petitioner's struggles with drug and alcohol abuse and how the Petitioner and the victim were attempting to work through their issues rather than proceed with the divorce.

General Weirich testified that she did not provide the defense with Ms. Taylor's statement in discovery. General Weirich acknowledged that Ms. Taylor provided information about the victim's episodes of paralysis, the sexual lifestyle of the Petitioner and the victim, the victim's cramping while having sex, the victim's admitting to have participated in a "threesome," and the victim's statements that she was unsure whether she was going to proceed with the divorce. According to Ms. Taylor, the victim told the Petitioner, "Let's just begin praying and see what the Lord is going to do with this marriage." General Weirich noted that she provided a supplemental police report in discovery that referenced Ms. Taylor's statement. General Weirich stated that according to the supplemental report, Ms. Taylor said that the victim "seemed upbeat" and was not complaining about problems with the Petitioner, that the victim had filed for divorce after discovering that the Petitioner was having an affair, that the victim and the Petitioner were attempting to work through their problems, that the victim was hospitalized due to an episode of temporary paralysis in December 2003, that the victim discussed her potassium and magnesium levels, and that the victim experienced a second episode of paralysis during the summer of 2004.

General Weirich stated that although she did not provide Ms. Hardin's statement to trial counsel in discovery, she provided a supplemental police report which summarized the statement. In her statement to the police, Ms. Hardin discussed incidents

of abuse by the Petitioner against the victim, including choking, slapping, and shoving the victim, the victim's restraining order against the Petitioner, the victim's episodes of paralysis, and the sexual lifestyle of the victim and the Petitioner. Ms. Hardin stated that the victim never told her that the Petitioner strangled or attempted to strangle her.

General Weirich did not provide Mr. James's statement to trial counsel in discovery. Numerous times throughout Mr. James's statement, he described the Petitioner as distraught, crying, and screaming after the victim died. General Weirich stated that she provided trial counsel with a supplemental police report which included a summary of Ms. James's statement in which he described the Petitioner's distraught state when the paramedics and police officers arrived following the victim's death.

General Weirich did not provide Lieutenant Fred Jackson's statement to trial counsel in discovery. Lieutenant Jackson informed police officers that he had to console the Petitioner and that the Petitioner was distressed about what he would do without his wife and what his children would do without their mother. General Weirich believed that she provided trial counsel with a police supplemental report that included a summary of Lieutenant Jackson's statement.

General Weirich said that while she did not provide Ms. Renee Welch's statement to trial counsel in discovery, she provided a supplemental police report that summarized Ms. Welch's statement. General Weirich acknowledged Ms. Welch informed police officers about the victim's prior episodes of paralysis after having sex that were similar to the episode described by the Petitioner in his statement to the police.

On cross-examination, General Weirich testified that she was not the prosecutor at the general sessions level and that she first saw the State's file when the Petitioner was arraigned in April 2005. She said that on occasion, witnesses or a victim's family members may bring items to court at the general sessions level and give them to the prosecution. She also said that it would not be unusual for the prosecutor to place any documents given to them at the general sessions level in a manila envelope and then attach it to the State's file. She noted that after the case proceeds through the general sessions level and the prosecutor's office receives the State report, the material, generally, is placed in a manila, legal-sized file. General Weirich stated that once she receives a file, she typically removes any items in a manila envelope and places them in the file so that she knows where the documents are located, and she retains the manila envelope. She also stated that she would have placed the typewritten documents from the victim and the Petitioner in a folder, such as the folder in Exhibit 6, and labeled them as "[i]tems not turned over." Others who had access to the State's file included General Wiseman, the division secretary, the investigator, the victim/witness coordinator, and any other assistant attorney general assigned to the division. General Weirich was unaware of

who had reviewed the State's file since the Petitioner's trial. She said she had no contact with the State's file following the hearing on the motion for new trial in May 2006 and up until "very recent times."

General Weirich testified that once a post-conviction petition is filed, the case is not assigned to the prosecutor who tried the case but is assigned to an assistant district attorney general assigned to the courtroom where the petition will be heard. General Weirich stated that she reassigns prosecutors to courtrooms on a yearly basis. She acknowledged that prosecutors usually do not spend a great amount of time on post-conviction cases until a hearing is set because they have many other pending cases and trials. The prosecutor assigned to a post-conviction case also engages in a discovery process and reviews the file with post-conviction counsel.

General Weirich did not recall what items she provided to trial counsel in discovery and said she retained a copy of the materials that she provided in discovery in a folder labeled "discovery." Unless a witness's statement includes exculpatory information, General Weirich generally does not provide the statement to the defense until after the witness testifies. If General Weirich does not call the witness at trial, she places the nontestifying witness's statement in a folder labeled "Not turned over to Defense." She said she often turns over *Jencks* material during the trial without defense counsel asking because it becomes part of the trial process. If the defense attorney requests *Jencks* material on multiple occasions, she provides the attorney the material without the attorney requesting it.

General Weirich stated that it appeared that she turned over all of the supplemental police reports in discovery even though the reports are specifically excluded under Tennessee Rule of Criminal Procedure 16. She acknowledged that the supplemental police reports included all of the information about the victim's paralysis, those to whom the Petitioner spoke following the victim's death, the Petitioner's prior instances of violence, the reconciliation of the marriage of the Petitioner and the victim, and their sexual lifestyle. General Weirich noted that none of the witnesses who provided statements reported that the Petitioner and the victim engaged in physical violence during sex and that each witness who was asked about strangulation during sex denied that the victim ever mentioned strangulation.

During the trial, General Weirich informed the trial court that trial counsel had been made aware of the existence of the recordings of the Petitioner's calls from the jail and that trial counsel failed to bring her a compact disc on which to copy the recordings. General Weirich testified that the prosecutor's office could not afford to provide compact discs to each defense attorney and that the office policy was to provide defense attorneys

with the option of either listening to the recordings at the prosecutor's office or providing a compact disc on which the prosecutor may copy the recordings.

General Weirich testified that the victim's handwritten journal, her typewritten letter to the Petitioner, and the Petitioner's typewritten letter did not relate to the facts of the case or the incident that led to the victim's death but constituted a discussion of their marital environment at the time that the letters were written. General Weirich did not believe that the documents constituted relevant statements of a defendant under Rule 16. She also did not believe that there were any means by which to establish where the letters were found or that the letters were admissible at trial. She agreed that the letters clearly established that the Petitioner and the victim were not engaged in a sexual relationship during the time period in which the letters were written and that she would have liked to have admitted them at trial.

General Weirich agreed that until a motion regarding prior bad acts is filed under Tennessee Rule of Evidence 404(b), much of the information pertaining to the prior bad acts is not discoverable because the information does not relate to the actual charged offense. She agreed that information relating to the Petitioner's prior bad acts would have been provided to trial counsel during the hearing and that trial counsel would have demanded the information had General Weirich not provided it to him. General Weirich maintained that her opening statements regarding the Petitioner's prior behavior did not relate to propensity but related to the State's claim of lack of mistake or accident. She said the trial court allowed her to discuss the Petitioner's prior bad acts during voir dire, her opening statements, and the State's case-in-chief.

On redirect examination, General Weirich testified that she could not say that she gave every supplemental police report to trial counsel in discovery. She acknowledged that the victim wrote the letter to the Petitioner discussing their marriage during the same year in which she died and that part of the proof that the State presented at trial was that the marriage between the Petitioner and the victim had "its ups and downs." With regard to the Petitioner's calls from the jail, General Weirich stated that many of the calls were between the Petitioner and trial counsel and that the Petitioner was aware of the content of the calls since he made them.

General Weirich testified that if she located a sealed envelope in the State's file, she would have opened it and likely filed and labeled the information in the envelope. She did not know anyone else with the initials "A.P.W." who had access to the State's file prior to, during, or after the trial. She stated that evidence is not supposed to be removed from the State's file at the post-conviction stage and that post-conviction counsel is allowed to review all of the evidence in the State's file.

General Weirich did not recall General Carriker sending her an email on March 25, 2011, asking to meet with her about the Petitioner's post-conviction case. She said she and General Carriker met on a prior occasion and discussed the envelope. She told General Carriker that she had no knowledge of the envelope. She could not recall whether her meeting with General Carriker occurred before a hearing was set or before General Carriker testified at the post-conviction hearing. General Weirich did not recall attaching a note stating, "Do not show Defense" to a file in any case. She said her typical practice was to use language such as "Items not turned over," "Not being turned over to Defense at this time," or "To be turned over to Defense at a later date."

Sergeant William Merritt testified that in 2004, he was employed with the Memphis Police Department and was the case coordinator for the investigation into the victim's death. At the time of the post-conviction hearing, he was a criminal investigator for the Shelby County District Attorney General's Office. Sergeant Merritt ordered that the recordings of the Petitioner's calls from the jail be turned over to him as part of the investigation. He acknowledged that some calls were between the Petitioner and his attorney and that some calls were three-way calls where the Petitioner called someone else who then called trial counsel. Sergeant Merritt listened to some of the recordings and prepared a summary of them. He said that calls directly from an inmate to counsel or from counsel to an inmate were generally deleted but that he listened to the three-way calls between the Petitioner, a third person, and trial counsel.

Sergeant Merritt testified that he interviewed Ms. Smith, recorded her formal statement, and prepared a summary of Ms. Smith's statement as part of his supplemental report. He asked Ms. Smith whether the victim mentioned that the Petitioner strangled her or pretended to strangle her during any of their sexual encounters, and Ms. Smith replied that the victim never mentioned it to her. Sergeant Merritt explained that he asked the question because the victim died from strangulation and that he had heard of people being strangled during sex. He was anticipating that the issue could arise later, and he wanted to know whether the Petitioner and the victim engaged in the practice.

Ms. Smith also informed Sergeant Merritt that the victim complained of cramps on the night before she died, which Sergeant Merritt stated was consistent with the Petitioner's statement to police. Ms. Smith provided him with additional information about the victim's prior episodes of paralysis and cramping following sex. Sergeant Merritt noted that the victim's records indicated that she had a magnesium and potassium deficiency. Ms. Smith told Sergeant Merritt about seeing the Petitioner at a display at a conference. When she told the victim, the victim replied, "I should have known that he was somewhere like that." Sergeant Merritt learned that the victim had filed for divorce from the Petitioner, and Ms. Smith told him that the victim decided against proceeding with the divorce.

Sergeant Merritt also interviewed Ms. Taylor, who discussed the Braswells' engaging in sexual activities with another woman. Ms. Taylor did not identify the other woman, and Sergeant Merritt did not have any information to determine the woman's identity. Sergeant Merritt stated that he would have interviewed the woman if she had engaged in erotic asphyxiation with the Petitioner and the victim. Ms. Taylor also informed him of the victim's prior episodes of paralysis, one of which was similar to the episode that the Petitioner said the victim experienced on the night of her death.

Ms. Hardin provided Sergeant Merritt with similar information regarding the sexual lifestyle of the Petitioner and the victim and the victim's prior episodes of paralysis. Sergeant Merritt noted that each witness denied that the victim participated in choking during sex. He also noted that according to the statements of the witnesses, the victim engaged in some activities only because the Petitioner wanted her to do so and not because she enjoyed them.

On cross-examination, Sergeant Merritt acknowledged that Ms. Taylor informed him that the victim stated that the Petitioner wanted her to engage in the "threesome" but that she did not want to do it. The victim told Ms. Taylor that she came home one day to find a woman there and that the victim eventually decided to do it. The victim called Ms. Taylor and told her of the decision after it occurred. The victim never told Ms. Taylor that she was engaging in erotic asphyxiation.

Dr. George Riley Nichols, II, a forensic pathologist, was accepted by the post-conviction court as an expert in pathology. He testified that on October 18, 2005, trial counsel contacted him about assisting in the evaluation of the cause of the victim's death, and Dr. Nichols agreed to help. Trial counsel provided Dr. Nichols with the autopsy report, the autopsy photographs, and a compact disc labeled "Braswell photos" that also included the autopsy photographs. Dr. Nichols said trial counsel did not provide him with any other information about the case. Dr. Nichols issued a report in which he agreed with Dr. Carter's findings that the victim's cause of death was manual strangulation. Dr. Nichols maintained that after he rendered his opinion, trial counsel did not pay him and never contacted him again.

Dr. Nichols stated that trial counsel never told him that he intended to present erotic asphyxiation as a theory of defense at trial and failed to provide him with sufficient information to properly analyze the cause and manner of the victim's death in the context of the defense of erotic asphyxiation. Dr. Nichols stated that trial counsel failed to provide him with witness statements, the victim's medical history, the personal and social history of the victim and the Petitioner, the police reports, photographs and sketches from the crime scene, and the Brawells' sexual history.

Dr. Nichols testified that based on the additional evidence that he had since reviewed, his initial opinion that the victim died due to manual strangulation did not change. He noted that erotic asphyxiation can involve manual strangulation, is potentially lethal, and could result in an accidental death. Dr. Nichols had been involved in five prior cases where the deaths occurred due to erotic asphyxiation. He said deaths due to erotic asphyxiation were characterized by petechial hemorrhages in the eyes, the lack of visible outward injuries, and hemorrhaging within the tissue of the neck. He also said the lack of visible outward injuries occurred when an item was placed between the ligature or hand and the person's neck to protect the neck from bruising. However, bruising occurred in those instances where nothing separated the ligature and the person's neck. He concluded that based on the additional evidence that he reviewed, the victim's death could have been consistent with erotic asphyxiation.

Dr. Nichols explained that the victim's jugular veins were compressed, causing an increase in blood pressure within the vascular system of the head, including the face and eyes, and resulted in petechial hemorrhages. The hyoid bone was not fractured, and there was a hemorrhage in the strap muscle along the left jugular vein. There was some hemorrhaging in the structures of the neck, within both the musculature and the hyoid bone. Dr. Nichols testified that had trial counsel provided him with information regarding the defense of erotic asphyxiation, he would have viewed the hemorrhaging in the victim's neck differently. He stated that based on his experience, finding evident fingertip bruising and fingernail markings on a decedent was atypical.

Dr. Nichols noted that the carotid arteries were not compressed and explained that less pressure was required to compress and obstruct blood flow through the jugular vein than through the arteries. He said the injuries to the victim's face were the result of the compression and obstruction of the veins and not the arteries. He also said the compression of the jugular veins would cause lack of blood flow to the brain and result in unconsciousness and anoxic injury to the brain if unrelieved. He testified that even when enough pressure is applied to create petechial hemorrhaging and hemorrhaging in the neck, the event is survivable. He stated that based on the amount of petechiae present, the compression occurred for thirty seconds or longer.

Dr. Nichols testified that an examination of defense wounds, such as scratches on a person's neck where she attempted to remove the chokehold or ligature or injuries to her hands where she attempted to inflict injury on another, was relevant in determining whether a person's death resulted from homicide or erotic asphyxiation. He noted that the victim had acrylic fingernails and that there was no evidence of injuries to the victim's hands or fingernails or any other defensive injuries that he would expect to find on a person who is being choked. He also noted that according to a photograph of the victim's body, an intact chain was discovered around the victim's neck.

Dr. Nichols testified that statement of those corroborating instances of erotic asphyxiation between the victim and the Petitioner would have been important in establishing that they had previously engaged in the activity but had survived. He said he was not provided with any information about sex toys in the home, which he stated could have been relevant to his examination.

Dr. Nichols identified acute injuries where white blood cells had not been brought into the area as an inflammatory response. He explained that white blood cells generally appear in the area of an injury or infection approximately six hours from the injury. He stated that based on the lack of white blood cells in areas of acute hemorrhaging, the injury likely occurred six hours or less from the time of the victim's death. He also stated that due to the assessment of the time frame, a review of the basic timeline of the Petitioner's version of the events would have been important.

Dr. Nichols stated that according to records from the emergency medical technician ("EMT"), the victim was in full rigor mortis when the EMT arrived. He noted that the victim was in a Jacuzzi bathtub where the water temperature was greater than the room temperature, which would have hastened the formation of stiffness in the muscle or rigor mortis. Dr. Nichols did not know the amount of time that the hot water hastened rigor mortis.

Dr. Nichols testified that information about the actual temperature of the water in the Jacuzzi bathtub could have affected his assessment. He said that a person immersed in hot water can overheat or experience hyperthermia which can result in death and that the hotter the water, the less amount of time that a person can withstand immersion without injury. He also said the heat in the water would have transferred to the victim if she was submerged in the water. Measurement of the victim's core temperature would have been necessary to determine whether hyperthermia had occurred.

Dr. Nichols noted that one of the photographs from the crime scene showed white foam in the victim's mouth, which could have indicated a narcotic overdose, acute heart failure, or inhalation of water or other material. He stated that while the victim's lungs were heavier than normal, they were not as heavy as he would have expected in drowning cases. He noted that water can drain out of a deceased person's body if the person is moved to his or her side. He said that information about whether the victim had been turned on her side for an extended period of time would have been important but that he was not provided with such information. Dr. Nichols stated that it would have been important for him to know whether the victim experienced previous episodes of paralysis that required hospitalization because it may have explained why the victim did not or was not able to get out of the bathtub prior to her death.

On cross-examination, Dr. Nichols testified that he received the materials from trial counsel on October 18, 2005, and that trial counsel initially contacted him sometime prior to that date. Trial counsel informed him that he was representing someone charged with a homicide in Memphis and asked Dr. Nichols to review some materials and provide an opinion. Dr. Nichols said he instructed trial counsel to "send [him] everything." Dr. Nichols stated that when he first received the materials from trial counsel, he believed that the cause of the victim's death was manual strangulation and the manner of her death was likely homicide because he did not know anything about the details surrounding her death. He explained that at the time, he believed he did not have sufficient information to render an opinion but that he issued a report because trial counsel informed his office that a report was necessary due to a pending trial date. Dr. Nichols did not contact trial counsel and tell him that he needed more information. Dr. Nichols testified that in retrospect, he probably should not have sent the report but should have called trial counsel and "yelled at him." Dr. Nichols acknowledged that in his letter to trial counsel dated October 24, 2005, he did not inform trial counsel that the information he received was insufficient to reach a conclusion and that his failure to do so was error. Dr. Nichols's opinions stated in the letter were consistent with Dr. Carter's conclusions. Following the letter, Dr. Nichols had no further communication with trial counsel.

Dr. Nichols testified that had trial counsel provided him with additional information, it could have affected his opinion. He explained that rather than concluding that the manner of death was homicide, the manner of death could be either accidental or "not determined." He said, "From everything I know so far today, I think it's probably not determined, which means it's a jury question." In preparing for his testimony at the post-conviction hearing, Dr. Nichols reviewed the materials originally submitted to him by trial counsel, the police reports, the EMT reports, a transcript of Dr. Carter's testimony at the preliminary hearing, and the crime scene photographs. He did not review the witness statements.

Dr. Nichols quoted trial counsel a retainer fee of $2,500 when trial counsel first contacted him. Dr. Nichols maintained that his office sent an invoice to trial counsel but that trial counsel never paid him.

On redirect examination, Dr. Nichols testified that based on the information that he had since reviewed, he would have testified at trial that the cause of the victim's death was asphyxia due to manual strangulation and that the evidence could have been consistent with erotic asphyxiation. He clarified that his opinion regarding the manner of the victim's death, and not the cause of the victim's death, had changed. He explained that the manner of the victim's death was inconclusive because it could be considered either homicide or accidental. He stated that since becoming aware of what other additional information was available prior to the trial, he believed he did not have

sufficient information to make an informed decision in 2005 and that he should not have sent the letter to trial counsel stating his conclusions.

Ms. Emmaleisha Monique Lane testified that she and the victim engaged in sexual acts in the Petitioner's presence and went to strip clubs together as a couple. Her relationship with the Petitioner and the victim lasted approximately two years. Ms. Lane said that during her sexual encounters with the Petitioner and the victim, they used sex toys and blindfolds and engaged in dominatrix style sexual activity. She stated that the victim and the Petitioner engaged in choking during which they utilized "safe words" and that the victim enjoyed it as a sexual act. After the Petitioner and the victim engaged in choking, Ms. Lane observed bruises and marks resulting from bites and spankings on the victim. Ms. Lane did not witness any violence that was not intended as a sexual act. She testified that she was contacted by someone and gave a statement about the Petitioner's case. She believed she gave the statement after the Petitioner's trial. She was never called to testify at trial.

On cross-examination, Ms. Lane testified that the choking involved hands around the neck and that no ligatures were used. She said that the relationship faded and that she had not been intimate with the Petitioner and the victim for approximately one year prior to the victim's death. She acknowledged that the victim did not want anyone to know about the relationship.

Mr. Dennis Small testified that in 2005, he was working as an armed guard at several clubs in Memphis, including a strip club. Mr. Small had known the Petitioner and the victim for several years and saw them at some of the clubs where he worked. Mr. Small recalled one occasion when he saw the victim at the strip club with another woman. He called the Petitioner and told him that the victim was at the strip club, and the Petitioner said he was aware of it and that he would be there shortly. After the Petitioner arrived, he left with the victim and the other woman about an hour later. Mr. Small stated that the Petitioner told him that it was his birthday and that the other woman was a "gift" from the victim. Mr. Small was aware that the Petitioner and the victim engaged in a "swinger type lifestyle."

Mr. Small testified that he spoke to the Petitioner on the telephone on the day of the victim's death and that the Petitioner was crying and saying that "she was gone." He recalled that the Petitioner was at a little league football game with his son and that the Petitioner had taken his son to the game because he wanted his sons to lead a normal life. Mr. Small was not contacted prior to trial and did not testify at trial.

Ms. Cheryl Wallace, the Petitioner's sister, testified that she was actively involved in assisting trial counsel in preparing the Petitioner's defense. She stated that she wrote a

check in the amount of $2,800 to trial counsel for Dr. Nichols's fees and that the check cleared her bank. After writing the check, Ms. Wallace did not hear anything further from trial counsel about Dr. Nichols, and Dr. Nichols did not testify at trial.

To pay for the Petitioner's defense, Ms. Wallace took out a $60,000 loan against her home, and the Petitioner and his mother each withdrew money from their retirement accounts. Ms. Wallace and her mother also paid the bills at the Petitioner's home for one year. The house eventually went into foreclosure.

Ms. Wallace hired Ms. Mikki Jackson to clean the Petitioner's home following his arrest. After Ms. Jackson cleaned the home, Ms. Wallace learned that a large amount of hair was found in the jets of the Jacuzzi. Ms. Wallace asked trial counsel to come to the home and have someone examine the Jacuzzi. She said that although trial counsel promised he would come to the home, he never visited the home or sent someone to examine the Jacuzzi.

Ms. Wallace testified that she informed trial counsel about the Braswells' sexual lifestyle. Ms. Wallace recalled taking a family trip to Texas with the victim and the Petitioner sometime near the Petitioner's birthday. During the trip, the victim purchased "stripper pole shoes" and told Ms. Wallace that she was going to dance for the Petitioner and that she would do whatever the Petitioner wanted. Ms. Wallace said that trial counsel never called her as a witness at trial.

On cross-examination, Ms. Wallace testified to her understanding that the Petitioner and the victim were "swingers." She said that she asked trial counsel to visit a club where the Petitioner and the victim were members.

Ms. Wallace stated that Ms. Jackson cleaned the Petitioner's home approximately one month after the victim's death. Ms. Wallace and her mother visited the home often to move items into storage during the month prior to Ms. Jackson's visit. On redirect examination, Ms. Wallace testified that no one had lived in the house during the month between the victim's death and Ms. Jackson's cleaning the house and that no one should have used the Jacuzzi during that time period. Ms. Wallace stated that she requested that trial counsel speak to Mr. Patrick Taliaferro, who performed heating and air conditioning repairs, and to have Mr. Taliaferro test the water in the Jacuzzi.

In 2014, Ms. Wallace contacted the Tennessee Board of Professional Responsibility ("BPR") and the Lawyer Fund for Client Protections due to trial counsel's nonpayment of expert fees. She said she received a response from the BPR that included a notice dated April 26, 2012, that trial counsel had been disbarred.

- 54 -

Ms. Mikki Jackson testified that she was hired to clean the Petitioner's home following the victim's death. She did not know how long after the victim's death that she cleaned the home but estimated that it was within a few days of the victim's death because there was food on the table that had not molded. Ms. Jackson stated that while cleaning the bathroom, she checked to see whether the Jacuzzi was working properly. She filled it up with water and discovered that the jets were not working. After draining the water, she removed from the suctions "lots of gobs" of shoulder-length, black hair that appeared to match the victim's hair. She threw the hair away and cleaned out the Jacuzzi, which then began working properly. She said that she initially did not tell anyone about the hair because she did not believe it was important and that she believed she later discussed her discovery with the Petitioner's sister. Ms. Jackson said she was contacted about making a statement regarding the hair but could not recall whether she was contacted before or after trial. She did not testify at trial but stated that she would have testified had she been requested to do so.

Mr. Patrick Taliaferro, who performed heating, ventilation, and air conditioning repairs, testified that he examined the Petitioner's water heater and Jacuzzi on August 14, 2005. He stated that the Petitioner's water heater had two electric heaters inside of it, that the thermostats could be manually set, and that both thermostats were set at 160 degrees. Mr. Taliaferro measured the water temperature based on the 160-degree setting and determined that the water was 147 degrees. He stated that the hottest temperature setting for the model of the Petitioner's water heater was 170 degrees, that the temperature for a water heater in a residence is supposed to be around 120 degrees, and that the standard temperature of water that a body can withstand is 120 degrees. Mr. Taliaferro stated that he provided the information to either the Petitioner or the Petitioner's sister and that trial counsel did not contact him or call him to testify at trial.

The Petitioner testified that following his arrest, he spoke to attorneys Mr. Jerry Stokes, Mr. Lee Wilson, and Mr. Wright and informed them that he and the victim engaged in erotic asphyxiation on the night of her death. The Petitioner retained them that day and said his family retained Mr. Ballin without his knowledge. Mr. Ballin and Mr. Wright both appeared in court on the Petitioner's first appearance date, and the Petitioner and his family elected to proceed with Mr. Ballin as counsel. The Petitioner also retained trial counsel, and both Mr. Ballin and trial counsel represented the Petitioner at the preliminary hearing. The Petitioner maintained that trial counsel met with him on the day following his arrest and that he informed trial counsel that he and the victim had engaged in erotic asphyxiation. The Petitioner recalled that during a jury-out hearing at trial, trial counsel called Mr. Wright to testify about the Petitioner informing him at the time of arrest that the Petitioner and the victim engaged in erotic asphyxiation. However, trial counsel never recalled Mr. Wright to present his testimony in front of the jury.

- 55 -

The Petitioner and his family actively researched issues during the pretrial phase and learned of allegations involving Dr. Carter's prior job performance. The Petitioner noted that in the whistleblower lawsuits, Dr. Carter was accused of asking someone to make inaccurate entries on autopsy reports, falsifying autopsy reports, and firing a subordinate whose conclusions did not match those of a prosecutor. The Petitioner also noted that in some cases, Dr. Carter disregarded the toxicology report and made determinations without reviewing the necessary body organs. The Petitioner maintained that he and a member of his family provided the information to trial counsel. Mr. Ballin questioned Dr. Carter about the allegations during the preliminary hearing, but Dr. Carter denied the allegations. The Petitioner stated that trial counsel failed to present the information at trial or bring forth any evidence to discredit Dr. Carter's prior testimony in which she denied the allegations.

The Petitioner testified that he informed trial counsel that the victim had potassium and magnesium deficiencies and that a few months prior to her death, she had episodes of paralysis in the Jacuzzi after drinking alcohol that were similar to the scenario that occurred on the night of her death. The Petitioner said he identified to trial counsel others who were aware of the episodes of paralysis and informed him that the episodes were mentioned in a police supplemental report. The Petitioner stated that trial counsel failed to obtain the victim's medical records or present the information to the jury at trial.

The Petitioner stated that shortly after his arrest in November 2004, he informed trial counsel that Mr. Taliaferro prepared a report regarding the temperature of the Petitioner's water heater. The Petitioner complained that trial counsel did not interview Mr. Taliaferro and that to his knowledge, trial counsel never went to his home and inspected the water heater or had anyone else inspect the water heater. When Mr. Burton testified at trial that all water heaters were set at 120 degrees, the Petitioner reminded trial counsel that his water heater was set at 160 degrees. Trial counsel did not present any witnesses to contradict Mr. Burton's testimony.

The Petitioner said that he learned that the victim informed Ms. Wallace of the "proclivities" of the Petitioner and the victim and that the Petitioner and Ms. Wallace shared this information with trial counsel. The Petitioner believed that trial counsel waited until the night before trial began to obtain some of the "adult items" used by the Petitioner and the victim. The Petitioner complained that trial counsel neither called Ms. Wallace to testify at trial nor otherwise presented the information possessed by her.

The Petitioner testified that he informed trial counsel about Ms. Jackson discovering hair entangled in the suctions of the Jacuzzi. The Petitioner believed that the information was important because it explained why he was unable to get the victim out of the Jacuzzi upon discovering her and that it would have corroborated his testimony at

trial and rebutted the State's argument that his claims that he was unable to get the victim out of the Jacuzzi were false. The Petitioner did not believe that trial counsel interviewed Ms. Jackson or otherwise followed up on the information.

The Petitioner stated that he informed trial counsel that Mr. Small, a security guard at a strip club, saw the victim and the Petitioner there on numerous occasions, including one occasion during which the victim was accompanied by another woman. The Petitioner maintained that trial counsel did not interview Mr. Small or otherwise follow up on the information and did not present Mr. Small as a witness at trial. The Petitioner also maintained that trial counsel did not present any of the information at trial through independent witnesses.

The Petitioner testified that in May or June of 2005, he told trial counsel that he and the victim had an intimate relationship with Ms. Lane and that Ms. Lane had firsthand knowledge of the Braswells' engaging in erotic asphyxiation. To the Petitioner's knowledge, trial counsel did not interview Ms. Lane or follow up on the information. The Petitioner said Ms. Lane's testimony would have contradicted the State's position that erotic asphyxiation was a newly fabricated defense and would have corroborated his testimony. The Petitioner noted that during closing arguments, the prosecutor argued that if the victim could walk through the doors, she would deny the Petitioner's allegations regarding their sexual lifestyle.

The Petitioner complained that trial counsel never had him declared indigent. He was incarcerated following his arrest and never made a bond. He said that because he believed he was going to be released on bond, he withdrew approximately $10,000 out of his retirement to pay for attorney's fees and other bills. The remaining money was donated, borrowed by his family, or was "scrape[d] up" by him. The Petitioner said his residence was to be sold to help fund his defense, but his home went into foreclosure. He also sold a motorcycle to obtain funds. He noted that at the time of trial, trial counsel had not been paid all of his fees. He maintained that in June 2005, trial counsel obtained $10,000 from his family, of which $2,000 or $3,000 was to pay for an investigator and that trial counsel never informed him that someone from his office served as an investigator.

The Petitioner testified that trial counsel approached him about retaining Dr. Nichols and that they discussed the importance of presenting expert testimony to contradict Dr. Carter's findings. The Petitioner stated that his family paid between $2,800 and $3,000 to retain Dr. Nichols. However, Dr. Nichols did not testify at trial, and trial counsel did not explain why he was not using Dr. Nichols. Rather, trial counsel only mentioned that he wanted to go in a different direction. Around the time that the Petitioner filed his petition for post-conviction relief, he wrote a letter to Dr. Nichols,

including what he believed to be pertinent information about the case. The Petitioner stated that Dr. Nichols said that he was unaware of the information that the Petitioner had provided him, that he had only been provided photographs and a brief letter, and that he was unaware of any information regarding erotic asphyxiation. Ms. Eskridge sent Dr. Nichols additional information, and trial counsel learned that Dr. Nichols changed his opinion to one that was favorable to the defense. The Petitioner complained that trial counsel failed to call a medical doctor at trial to counter Dr. Carter's testimony.

The Petitioner testified that on the night before trial began, trial counsel informed him of locating an expert that trial counsel planned to use if the Petitioner's family would pay the expert's fee. The Petitioner stated that he met with Dr. Schwartz for thirty to forty-five minutes on the night before Dr. Schwartz testified and that he did not have an opportunity to fully explain his relationship with the victim to Dr. Schwartz. The Petitioner also stated that while Dr. Schwartz testified at trial about erotic asphyxiation from a theoretical perspective, he did not discuss erotic asphyxiation as it related to the relationship between the Petitioner and the victim.

The Petitioner maintained that trial counsel did not discuss with him the presentation of the proof, the State's presentation of evidence of his prior bad acts, or the repercussions of any attempts to introduce evidence of his good character. The Petitioner did not believe that trial counsel was successful in attempting to present evidence of his good character and complained that trial counsel failed to present evidence that the Petitioner's acts of domestic violence against the victim occurred before he became sober.

While the Petitioner never saw Ms. Taylor's statement to the police, he believed it included information about the relationship between him, the victim, and Ms. Lane. He did not know whether trial counsel had the opportunity to follow up on the information. While reviewing a police supplement following his conviction, he noticed that when Sergeant Merritt interviewed Ms. Smith, he asked her "out of the blue" about whether the Petitioner and the victim engaged in choking during sex.

The Petitioner stated that the victim filed for divorce in May or June of 2004 and decided to dismiss the divorce in early August 2004. He said that he and the victim wrote letters to each other and that the letters were "somewhere in our personal effects, at home, or our office." He was unaware that the State had the letters and said he never received a copy of the letters prior to trial.

The Petitioner did not listen to the recordings of his telephone calls from the jail before they were played at trial, and to his knowledge, trial counsel did not review the recordings before trial. The recordings included the Petitioner's conversations with trial

counsel. The Petitioner stated that trial counsel never stopped him from talking during the calls and did not tell him that the calls were being recorded. The Petitioner said that although a recording at the beginning of the call informed him that the call was being recorded, he believed his conversations with trial counsel were safe "to some extent." The Petitioner complained that trial counsel never explained to him that the calls to him were not protected and that trial counsel never presented a witness at trial to testify about whether inmates had access to a separate telephone line at the jail in which to contact attorneys.

The Petitioner was aware that a sealed manila envelope with a note on the front was located at some point during the pendency of the post-conviction proceedings. He stated that to his knowledge, the State never turned over the contents of the envelope to his post-conviction counsel.

On cross-examination, the Petitioner testified that Ms. Eskridge told him about the sealed envelope during the late spring or early summer of 2011 near the end of her representation. He said Ms. Eskridge essentially told him that she discovered an envelope and was attempting to learn of its contents.

The Petitioner acknowledged that according to his statement to the police, the victim got into the Jacuzzi between 1:30 and 1:40 a.m., and he did not find her until 3:40 a.m. He agreed that the timeline of the victim being left unattended in the Jacuzzi changed substantially during his testimony at trial. At trial, the Petitioner testified that the victim was not left unattended from 1:30 or 1:40 a.m. and that he and the victim returned to the Jacuzzi at 3:00 a.m. The Petitioner testified that when he found the victim, she was on her side with her head approximately three-quarters of the way under water. Her mouth was submerged, but some portions of her head, such as her ear, were not. When the Petitioner called 9-1-1, he reported that he was unable to get the victim out of the water. He stated that when the paramedics arrived, the upper portions of the victim's torso, her shoulders, and her head were out of the Jacuzzi. He also stated that while he could have gotten the victim out of the Jacuzzi, he began to hear the sirens once he was able to get the upper portion of her body out of the water and stopped to make sure that the first responders could locate his home.

The Petitioner did not believe that trial counsel ever visited his home, viewed the Jacuzzi, or took measurements of it. The Petitioner testified that the temperature on the hot water heater was higher to prevent the water from getting cold in the Jacuzzi. He explained that the victim would turn on the hot water and have it continue to trickle or pour into the Jacuzzi as she soaked.

The Petitioner believed that had Dr. Schwartz spent more time with him and gathered more historical information, Dr. Schwartz would have been better able to explain the proclivities in the Braswells' relationship. The Petitioner said Dr. Schwartz could have obtained the information from him and other sources. The Petitioner believed that the trial court's decision limiting Dr. Schwartz's testimony at trial was based on the fact that Dr. Schwartz was not disclosed until the "last minute."

The Petitioner did not recall when he last saw the letters that he and the victim wrote to each other but believed they were somewhere in his bedroom. He then stated that he did not know where they were inside his home. He did not know whether the victim gathered the letters to take them to her divorce attorney.

The Petitioner believed that the telephone calls with trial counsel that were admitted at trial were three-way calls where he called a family member, who then called trial counsel. During one of the calls entered into evidence at trial, the Petitioner shared with trial counsel his concerns about Mr. Ballin's representation based on information that trial counsel had shared. Trial counsel informed him that he was charged with strangling the victim, and the Petitioner denied the accusation several times. The Petitioner noted that the other telephone conversations with trial counsel that were entered into evidence involved whether trial counsel had completed tasks for him. The Petitioner believed that the recordings of three or four telephone calls were played to the jury. He acknowledged that during one of the calls to another person, he included "code" language about Ms. Woods.

On redirect examination, the Petitioner testified that he and his family provided trial counsel with funds to retain an expert but that they were unaware of what happened to the expert or where the money went. According to the Petitioner, trial counsel went to his brother and mother on the eve of trial and told them that if they did not pay for another expert, no expert would testify at trial and that the Petitioner would likely be convicted of the charges. The Petitioner stated that trial counsel retained Dr. Schwartz on the Sunday night before trial began and did not prepare Dr. Schwartz to testify, which showed when he was cross-examined by the State.

The Petitioner stated that while he was provided with summaries of his telephone calls from the jail in discovery, the summaries did not prepare him for the recordings that were entered into evidence and played for the jury at trial. He recalled that after giving his initial statement to the police, he decided that he wanted to give another statement. He informed the officer that he wished to give another statement but that he wanted his attorney present. He explained that he did not give a second statement because his attorneys instructed him against it.

The Petitioner explained that he did not mention erotic asphyxiation to the police due to "[s]hame" and said he did not believe that it had anything to do with the victim's death at that time. He affirmed that during opening statements, co-counsel stated that he intended to establish a pattern of choking as part of the Petitioner's sexual lifestyle. The Petitioner complained that trial counsel and co-counsel failed to establish such a pattern at trial. The Petitioner said that during closing arguments, his counsel stated that a pattern was established and that one of the jurors looked "extremely skeptical" and shook his head. The Petitioner disagreed that co-counsel was alluding to the Petitioner's testimony at trial to establish a pattern of choking.

### The State's Proof

Assistant District Attorney General Glen Baity testified that he was assigned as division leader in the post-conviction court's courtroom for one year in 2011. At that time, General Carriker was an assistant in the division. General Baity did not recall General Carriker informing him of locating a folder or an envelope marked "not turned over to defense." General Baity stated that he would have remembered the conversation had it occurred. He also did not recall a defense attorney approaching him about an envelope or a discussion in open court about a problem with discovery in a post-conviction case. On cross-examination, General Baity testified that he did not recall any conversations with General Carriker about the Petitioner's case.

Assistant District Attorney General Betsy Wiseman testified that she served as co-counsel for the State during the Petitioner's trial and that she was the division leader in the post-conviction court's courtroom from January 2008 through December 2010. General Carriker was assigned to the division while General Wiseman was division leader. She did not recall any conversations with General Carriker about the Petitioner's post-conviction case and did not recall him approaching her with any problems with the case. She said that while she received an email from General Carriker about the case on March 25, 2011, nothing in the email indicated that there were any problems with the case, and General Carriker did not include questions regarding how to proceed with any issues that had arisen.

General Wiseman testified that she had never known General Weirich to seal items inside an envelope and did not recall her doing so in the Petitioner's case. General Wiseman stated that items that could have been received in manila envelopes included autopsy reports, documents received while the case was in general sessions court, and additional information received by law enforcement after the officers submitted their official State report. General Wiseman understood the folder labeled "items not turned over" in Exhibit 6 was an effort to maintain a record of those items that were not discoverable and, therefore, not provided to the defense. She denied hiding or destroying

- 61 -

information in the file and said that if she wanted to hide something from the defense, she would not have placed it in an envelope in the file with a note that said, "do not give to defense."

General Wiseman recalled that up until the beginning of trial, she and General Weirich believed that the defense theory would be that the victim drowned while bathing. She said that the first indication that the defense theory would not be drowning was when trial counsel informed them of the defense expert on the morning of trial.

On cross-examination, General Wiseman testified that she did not believe that she placed the documents in Exhibit 6 in the folder because General Weirich's handwriting was on the note that was on the folder. General Wiseman believed General Weirich selected which documents to place inside the folder. General Wiseman stated that if anything was sealed inside a manila envelope, she would not have been the person who did so and that she would have recalled if any items were sealed in a manila envelope because such a practice was "highly unusual." General Wiseman stated that if she had come across a sealed envelope in preparing for trial, she would have spoken to General Weirich about it and opened the envelope. General Wiseman did not recall this occurring. She acknowledged that something could have been placed in the State's file after the case was closed.

General Wiseman testified that she prepared a written summary of the Petitioner's telephone calls from jail and believed she provided trial counsel with both the summary and a compact disc that included the recordings. However, following her testimony, the State agreed that trial counsel did not have a copy of the recordings. General Wiseman then testified that trial counsel was made aware of the recordings and never requested a copy of them.

Assistant Attorney General Marques Young testified that he represented the State during the Petitioner's post-conviction proceedings until he left the Shelby County District Attorney General's Office to be a federal prosecutor. He was assigned the case during the summer of 2012, replacing General Cox. He stated that at that time, he did not take any action in the case because he was waiting on the Petitioner to file an amended petition. As a result, the file remained in General Cox's office until 2013.

General Young first reviewed the State's file in 2013 after General Carriker came into his office and informed him about a discussion with post-conviction counsel about an envelope that General Carriker and Ms. Eskridge found while reviewing the State's file. General Carriker advised General Young that the envelope had a note on it that mentioned items that were not provided to the defense. General Young maintained that this was the first time that he had heard of the issue. He did not have the file in his office

- 62 -

at that time. Upon retrieving the file, General Carriker searched it but was unable to locate the envelope.

General Carriker returned to General Young's office approximately one week later during which time they both searched the State's file, which had remained in General Young's office. While searching the file, General Carriker used an email exchange between him and Ms. Eskridge to refresh his memory. On April 4, 2011, General Carriker sent an email to Ms. Eskridge stating that he enjoyed meeting with her that day and asking her to forward a copy of the final amended petition because he did not have a copy. Ms. Eskridge responded in an email,

> Please find attached a list of requested items from [the Petitioner]. The list was drafted by [the Petitioner] and a copy sent to [the post-conviction court]. However, he neglected to send you a copy. I will also send a copy of the petition. I was unable to come back to see you last week. Let me know how your conversation went with Carnas Dale [sic] regarding items not provided to the defense in discovery. Also, let me know what items you are able to secure. Thanks, I'll touch base again with you soon.

Attached to Ms. Eskridge's email was a four-page list of items. General Young stated that a number of the items would not have been in the State's file and that none of the items would have been difficult to secure.

General Young testified that while reviewing the file, General Carriker located a manila folder with a note on it that appeared to be the folder entered as Exhibit 6 during the post-conviction hearing. General Young said that once General Carriker located the folder, General Carriker appeared relieved and said he was "pretty sure this was it."

On cross-examination, General Young testified that while he believed that he did not speak to post-conviction counsel about the envelope until General Carriker brought the issue to his attention, he could have been mistaken. He acknowledged that General Carriker testified during the post-conviction hearing that he was unsure whether Exhibit 6 was the envelope that he saw during his meeting with Ms. Eskridge.

Assistant District Attorney General Byron Winsett, the chief prosecutor of the public corruption and economic crime unit, testified that he began an investigation that involved trial counsel in June 2013. Trial counsel's attorney presented an offer of pre-indictment settlement on trial counsel's behalf, which the State accepted. General Winsett recalled that the proposal involved the payment of money and that the State had been promised that payment was forthcoming. Trial counsel's attorney later informed General Winsett that he was withdrawing from representing trial counsel and that he did

not believe that the money would ever be paid. General Winsett stated that had trial counsel paid the money and met other stipulations, the State would not have sought an indictment, and the case would have been concluded. General Winsett testified that the case could still be prosecuted.

At the conclusion of the proceedings, the post-conviction court entered an 81-page order denying the Petitioner's claims of ineffective assistance of counsel and prosecutorial misconduct. The Petitioner filed a timely notice of appeal.

## ANALYSIS

The Post-Conviction Procedure Act provides for relief when a petitioner's "conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. The burden of proving allegations of fact by clear and convincing evidence falls to the petitioner seeking relief. T.C.A. § 40-30-110(f). The post-conviction court's findings of fact are binding on the appellate court unless the evidence preponderates against them. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). Accordingly, the reviewing court defers to the post-conviction court's findings regarding the credibility of witnesses, the weight and value of witness testimony, and the resolution of factual issues. *Id*. Questions of law and mixed questions of law and fact are reviewed de novo. *Id*.

## I. Ineffective Assistance of Counsel

The Petitioner contends that he received ineffective assistance of counsel at trial due to trial counsel's failure (1) to conduct a complete investigation and to interview witnesses, (2) to have the Petitioner declared indigent, (3) to retain the necessary experts and provide experts with the necessary information, (4) to object to evidence entered at trial, (5) to properly cross-examine witnesses, (6) to rehabilitate witnesses, (7) to adhere to his fiduciary duty, and (8) to fulfill his promise to the jury during opening statements.

Under the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution, the accused is guaranteed the right to effective assistance of counsel. *Moore v. State*, 485 S.W.3d 411, 418 (Tenn. 2016). To prevail on a claim that he was denied his constitutional right to effective assistance of counsel, a petitioner must prove both that counsel's performance was deficient and that the deficient performance caused prejudice to the defense. *Kendrick*, 454 S.W.3d at 457 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). A claim may be denied for failure to establish either deficiency or prejudice, and the reviewing court need not address both components if a petitioner has failed to establish one. *Goad v. State*, 938 S.W.2d 363,

370 (Tenn. 1996). Each element of a claim of ineffective assistance of counsel is a mixed question of fact and law reviewed de novo. *Kendrick*, 454 S.W.3d at 457.

"Establishing deficient performance requires showing 'that counsel's representation fell below an objective standard of reasonableness,' which standard is measured by 'professional norms' prevailing at the time of the representation." *Garcia v. State*, 425 S.W.3d 248, 256-57 (Tenn. 2013) (quoting *Strickland*, 466 U.S. at 688). So long as counsel's representation was "'within the range of competence demanded of attorneys in criminal cases,'" counsel will not be deemed to have performed deficiently. *Felts v. State*, 354 S.W.3d 266, 276 (Tenn. 2011) (quoting *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). Deficient performance requires a showing of errors so serious that "'counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" *Id*. (quoting *Strickland*, 466 U.S. at 687).

The reviewing court should not second-guess strategic choices or measure counsel's performance by "'20-20 hindsight.'" *Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997) (quoting *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982)). In reviewing counsel's professional decisions, a "'fair assessment ... requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Goad*, 938 S.W.2d at 369 (quoting *Strickland*, 466 U.S. at 689). Strategic decisions based on a thorough investigation of law and relevant facts are virtually unchallengeable. *Felts*, 354 S.W.3d at 277. However, deference is only given to strategic decisions which "are informed ones based upon adequate preparation." *Moore*, 485 S.W.3d at 419.

In determining prejudice, the reviewing court must decide if there is "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Calvert v. State*, 342 S.W.3d 477, 486 (Tenn. 2011) (quoting S*trickland*, 466 U.S. at 694). A reasonable probability is "'a probability sufficient to undermine confidence in the outcome.'" *Id*. (quoting *Strickland*, 466 U.S. at 694).

### A. Failure to Investigate and Interview Witnesses

The Petitioner asserts that trial counsel failed to properly investigate and interview witnesses regarding the amount of hair found in the Jacuzzi, the temperature setting of the hot water heater, and the Braswells' sexual lifestyle. The Petitioner also challenges trial counsel's failure to obtain and review a copy of the recordings of the Petitioner's telephone calls from the jail prior to trial and his failure to retain an investigator.

Although trial counsel does not have an absolute duty to investigate particular facts or a certain line of defense, counsel has a duty to conduct a reasonable investigation or make a reasonable decision rendering a particular investigation unnecessary. *Strickland*, 466 U.S. at 691. Furthermore,

> [n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel. Rather, courts must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct, and judicial scrutiny of counsel's performance must be highly deferential.

*Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000) (internal citations and quotations omitted). There are "'countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.'" *Harrington v. Richter*, 562 U.S. 86, 106 (2011) (quoting *Strickland*, 466 U.S. at 689). Cases rarely exist in which the "'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach." *Id*. (quoting *Strickland*, 466 U.S. at 689).

A reasonable investigation does not require counsel to "'leave no stone unturned.'" *Robert Faulkner v. State*, No. W2012-00612-CCA-R3-PD, 2014 WL 4267460, at *87 (Tenn. Crim. App. Aug. 29, 2014) (quoting *Perry Anthony Cribbs v. State*, No. W2006-01381-CCA-R3-PD, 2009 WL 1905454, at *48 (Tenn. Crim. App. July 1, 2009)). "'Reasonableness should be guided by the circumstances of the case, including information provided by the defendant, conversations with the defendant, and consideration of readily available resources.'" *Id*. (quoting *Perry Anthony Cribs*, 2009 WL 1905454, at *48). The "inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions." *Strickland*, 466 U.S. at 691.

Following the victim's death on November 5, 2004, the Petitioner gave a statement to the police in which he provided a version of events suggesting that the victim drowned. The Petitioner was arrested on November 6, 2004. The preliminary hearing was held in December 2004; the Petitioner was indicted in May 2005; and the trial was held in December 2005. Accordingly, trial counsel represented the Petitioner for approximately one year prior to the trial.

During this time period, trial counsel's initial investigation focused on a defense theory of accidental drowning. Based on his investigation, he concluded that the defense

- 66 -

could not be supported and decided to attempt to create reasonable doubt as a defense. Shortly before trial, trial counsel decided to present a defense theory of accidental death from erotic asphyxiation and testified during the post-conviction hearing that this decision was based on the Petitioner's revelation that he and the victim engaged in erotic asphyxiation on the night of her death.

While the Petitioner claims that trial counsel was deficient in failing to investigate various areas in relation of the victim's death, the Petitioner does not allege that trial counsel should have pursued and presented a different defense theory at trial. Thus, this court will view the reasonableness of trial counsel's conduct in light of the defense of erotic asphyxiation that was presented at trial.

### 1.  Hair Found in the Jacuzzi

The Petitioner asserts that trial counsel was ineffective in his investigation of hair found in the suctions of the Jacuzzi by Ms. Mikki Jackson while cleaning the Jacuzzi sometime after the victim's death. The Petitioner specifically alleges that trial counsel failed to visit the Petitioner's home and view the scene, failed to follow up on information provided by Ms. Cheryl Wallace regarding Ms. Jackson's discovery, and failed to interview Ms. Jackson. The Petitioner argues that this evidence could have been presented at trial to establish that the victim's hair was caught in the suctions, thus, explaining why the Petitioner was unable to get the victim out of the Jacuzzi upon discovering her there.

As found by the post-conviction court, however, trial counsel investigated the possibility that the victim's hair became entangled in the Jacuzzi's suctions. Trial counsel acknowledged that the Petitioner stated that the victim's hair had been stuck in the Jacuzzi's suctions, and trial counsel was aware that another witness discovered hair in the Jacuzzi and a nipple ring. Trial counsel visited the Petitioner's home to view the Jacuzzi and observed screens over the suctions, researched the pressure asserted from the suction systems, interviewed two plumbers who installed the devices about the mechanics of the Jacuzzi, obtained a manual on the Jacuzzi, and researched civil suits involving similar allegations of a defect in the Jacuzzi.

The post-conviction court credited trial counsel's testimony that he decided not to focus on the hair because the evidence could also suggest that an altercation occurred between the Petitioner and the victim. Trial counsel explained that any witness who testified about the discovery of the hair in the suctions would have to acknowledge that he or she did not know how the hair got into the suction system and that the hair may have been in the water before it was sucked into the suction system. Trial counsel noted that the scenario of the Petitioner's attempts to get the victim out of the Jacuzzi being

thwarted by the victim's hair stuck in the suctions raised questions as to why the Petitioner did not simply drain the water from the Jacuzzi and turn off the jets. As a result, trial counsel chose to proceed with caution to avoid a scenario whereby the jury would question the Petitioner's veracity. We conclude that trial counsel made a reasonable strategic decision based on an adequate investigation and that trial counsel was not deficient in this regard. *See Felts*, 354 S.W.3d at 277.

### 2. Temperature of the Water

The Petitioner maintains that trial counsel failed to conduct a proper investigation into the temperature of the water in the Jacuzzi as it related to the temperature setting of the hot water heater. The Petitioner complains that trial counsel failed to interview Mr. Patrick Taliaferro or retain an expert in residential water heaters. According to the Petitioner, evidence that the temperature of his hot water heater was set at a higher temperature, which resulted in hotter water flowing into the Jacuzzi, would have rebutted Mr. Burton's testimony at trial and the prosecution's claims that the Petitioner staged the crime scene by adding hot water to the Jacuzzi prior to the arrival of law enforcement.

However, as the post-conviction court found, trial counsel conducted research and consulted with others about the mechanics of Jacuzzis. He reviewed Mr. Taliaferro's report and spoke to an investigating officer about the temperature of the water in the Jacuzzi. The post-conviction court noted trial counsel's testimony that he decided against further pursuing the information because he wanted to focus on presenting a defense on how the death occurred rather than simply attempting to raise reasonable doubt. We conclude that trial counsel made a reasonable, strategic decision against continuing to focus his investigation on the water temperature and that, therefore, trial counsel was not deficient.

### 3. Sexual Lifestyle

The Petitioner contends that trial counsel was ineffective in investigating the Braswells' sexual lifestyle by failing to follow up on information provided by Ms. Wallace and by failing to interview Mr. Dennis Small and Ms. Monique Lane. The post-conviction court found that the testimony of Ms. Lane and Mr. Small would have demonstrated that the Petitioner and the victim had a history of deviant sexual activity, supporting the Petitioner's defense of consensual erotic asphyxiation. The post-conviction court found that trial counsel, however, was unable to locate Mr. Small once his place of business closed. Finally, the post-conviction court found that trial counsel's failure to interview and present Ms. Lane as a witness at trial did not result in prejudice because evidence of the Braswells' practice of engaging in erotic asphyxiation was presented through the Petitioner's testimony.

Contrary to the post-conviction court's findings, it was a former officer who owned a "swinger's club" and not Mr. Small with whom trial counsel lost contact once the business closed. Trial counsel testified that he did not recall the Petitioner informing him of Mr. Small. Nevertheless, trial counsel was aware that the Petitioner and the victim frequented strip clubs, and trial counsel had information from multiple sources, including discovery provided by the State, about the Braswells' sexual lifestyle. Trial counsel explained that he wanted testimony about the Braswells' sexual relationship to come from the Petitioner because the Petitioner was the only person who had firsthand knowledge of the relationship and because the prosecutors would not be able to effectively cross-examine the Petitioner about the relationship. Trial counsel also obtained various sexual toys used by the Braswells and introduced them at trial. Moreover, neither Ms. Wallace nor Mr. Small witnessed the Petitioner and the victim engaging in sexual acts, including erotic asphyxiation. Accordingly, we conclude that trial counsel was not deficient in declining to present the testimony of Ms. Wallace and Mr. Small at trial.

Trial counsel, however, acknowledged that the Petitioner identified Ms. Lane as someone with whom the Braswells had been involved in a sexual relationship and that trial counsel failed to interview her. Trial counsel offered inconsistent testimony during the post-conviction hearing regarding whether he would have called Ms. Lane as a witness at trial had he interviewed her. Nevertheless, we conclude that trial counsel was deficient in failing to interview Ms. Lane, as she had firsthand knowledge of the sexual activities in which the Petitioner and the victim engaged, including erotic asphyxiation.

However, we cannot conclude that there is a reasonable probability that the verdict would have been different had trial counsel presented Ms. Lane's testimony at trial. *See Calvert*, 342 S.W.3d at 486. The evidence presented at trial supporting the Petitioner's guilt was strong. Although the Petitioner testified that he and the victim engaged in erotic asphyxiation on three occasions on the night of the victim's death, his statements to the police, his friends, and multiple other witnesses following the victim's death differed from his testimony at trial. The Petitioner described the erotic asphyxiation as involving the use of a choke hold. Dr. Carter, however, disagreed that the victim's injuries were consistent with the application of a choke hold and stated that placing the victim in a choke hold by using the forearm would have inflicted a wider distribution of pressure-related injuries rather than the individual areas of injury found on the victim's body. Following the victim's death, the Petitioner continued his relationship with Ms. Woods and attempted to hide her from the police. While Ms. Lane previously witnessed the Braswells engaging in erotic asphyxiation, her relationship with them ended approximately one year before the victim's death, and she could not offer any testimony about the events that occurred on the night of the victim's death. Accordingly, trial counsel's deficiency did not result in prejudice.

#### 4. Recordings of the Petitioner's Calls from Jail

The Petitioner maintains that trial counsel was ineffective in failing to obtain and review the recordings of the Petitioner's telephone calls from the jail prior to trial. Trial counsel should have been aware of the existence of the recordings because the State provided in discovery a listing of the calls, which included a brief summary of some of the calls. Trial counsel, however, failed to listen to the recordings prior to trial and was not prepared to challenge the admission of the recordings at trial. The post-conviction court found, and we agree, that trial counsel was deficient.

At trial, trial counsel objected to the admission of the recordings of the telephone conversations between counsel and the Petitioner on the basis of attorney-client privilege. The calls occurred when the Petitioner called a third party who then called trial counsel and allowed the Petitioner and trial counsel to speak. The trial court found that the attorney-client privilege had been waived and admitted the recordings into evidence. Trial counsel did not object to the admission of the recordings on any other basis at trial. The Petitioner has failed to identity what portions of the recordings that trial counsel could have successfully excluded had he listened to the recordings prior to trial or the basis upon which those portions were excludable. Accordingly, the Petitioner has failed to establish that trial counsel's deficiency resulted in prejudice.

#### 5. Failure to Retain an Investigator

The Petitioner contends that trial counsel was ineffective in failing to retain a private investigator. There is no rule requiring defense counsel to retain an investigator in every case. *See e.g., Tyrone Chalmers v. State*, No. W2006-00424-CCA-R3-PD, 2008 WL 2521224, at *28 (Tenn. Crim. App. June 25, 2008) (holding that defense counsel was not ineffective in failing to retain an investigator in the defendant's capital case). As noted by the post-conviction court, trial counsel chose to utilize attorneys and other employees in his office with investigative experience to conduct the investigation. They interviewed witnesses, consulted multiple experts, conducted research, and reviewed the physical evidence. The Petitioner has failed to establish that trial counsel was deficient or that any deficiency resulted in prejudice.

### B. Failure to Have the Petitioner Declared Indigent

The Petitioner contends that trial counsel was ineffective in failing to request that the trial court declare the Petitioner indigent for purposes of obtaining expert services. The Petitioner, however, failed to include any argument in his brief to support his claim. It is well-established that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."

*See* Tenn. Ct. Crim. App. R. 10(b); *see also* Tenn. R. App. P. 27(a)(7) (A brief shall contain "[a]n argument ... setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record ... relied on."). Accordingly, this issue is waived. Notwithstanding waiver, the Petitioner has failed to establish that he was indigent at the time of the trial, and, therefore, he has not shown that trial counsel was deficient in failing to request that the trial court declare the Petitioner indigent.

## C. Failure to Utilize Experts

The Petitioner contends that trial counsel was ineffective in failing to properly utilize Dr. Nichols and provide him with all of the information necessary to render an opinion. The Petitioner also contends that trial counsel was ineffective in waiting until shortly before trial to retain Dr. Schwartz.

The Tennessee Supreme Court recently recognized that in most cases, "the decision to select an expert, or which expert to select, constitutes one of the 'strategic' defense decisions that *Strickland v. Washington* shields from scrutiny." *Kendrick*, 454 S.W.3d at 475. "The selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that, when made 'after thorough investigation of [the] law and facts,' is 'virtually unchallengeable.'" *Hinton v. Alabama*, 571 U.S. __, 134 S. Ct. 1081, 1089 (2014) (quoting *Strickland*, 466 U.S. at 690); *see Kendrick*, 454 S.W.3d at 474.

The post-conviction court found that trial counsel intended to utilize Dr. Nichols as a consulting expert rather than an expert who would testify at trial. Trial counsel explained that at the time he retained Dr. Nichols, trial counsel was pursuing a defense of accidental drowning, and trial counsel had concerns regarding the validity of Dr. Carter's findings based upon his interactions with Dr. Carter and his knowledge of her prior history. Dr. Nichols issued an opinion agreeing with Dr. Carter's findings. While Dr. Nichols testified that he should not have rendered an opinion based upon the information that trial counsel provided, Dr. Nichols acknowledged that he never communicated this to trial counsel.

Once trial counsel decided to pursue a defense theory of erotic asphyxiation, he consulted with Dr. Chancellor, the Shelby County Medical Examiner; Dr. Smith, a former medical examiner; and Dr. Brooks, a physician. The post-conviction court noted that trial counsel's testimony that he believed Dr. Chancellor would be an unbiased witness even though she had approved the victim's autopsy report. None of these medical experts could offer findings that were consistent with the Petitioner's testimony at trial. Trial counsel decided to call Dr. Chancellor as a witness at trial because she

made some findings that were favorable to the defense. However, during the trial, Dr. Chancellor informed trial counsel that she believed the Petitioner would have had to continue choking the victim for several minutes after the victim passed out. As a result, trial counsel decided not to call Dr. Chancellor as a witness. A defense attorney "is not required to question a diagnosis put forth by a professional expert in the field." *Christa Gail Pike v. State*, No. E2009-00016-CCA-R3-PD, 2011 WL 1544207, at *54 (Tenn. Crim. App. Apr. 25, 2011). Once trial counsel consulted with these three medical professionals, he was not required to continue to shop for other medical experts who might agree with the Petitioner's version of the events. We conclude that trial counsel was not deficient in his utilization of medical experts during his investigation.

With regard to trial counsel's retention of Dr. Schwartz shortly before trial, we note that the post-conviction court did not make any findings as to when the Petitioner informed trial counsel that he and the victim engaged in erotic asphyxiation the night of the victim's death. Rather, the post-conviction court found that although Dr. Schwartz was retained "at the last minute," he based his opinion on the autopsy, crime scene photographs, his examination of the Braswells' sex toys, and an interview with the Petitioner during which he learned about the safety signals utilized by the Braswells. The post-conviction court concluded that Dr. Schwartz's testimony was likely credible to the jury and was not impaired by any appearance of lack of preparation.

The Petitioner has presented no evidence regarding how Dr. Schwartz's testimony would have differed had trial counsel retained him sooner. We conclude that based on the evidence presented at trial, there is not a reasonable probability that the verdict would have been different had Dr. Schwartz been retained at an earlier date. Accordingly, even if trial counsel was deficient, such deficiency did not result in prejudice.

### D. Failure to Object to Evidence Presented at Trial

The Petitioner contends that trial counsel rendered ineffective assistance of counsel by failing to object to the prosecutor's improper statements during opening statements and evidence that was inadmissible under Tennessee Rule of Evidence 404(b), improper lay opinions, and inadmissible hearsay.

### 1. The Prosecutor's Opening Statement

Prior to trial, the State filed a notice of its intent to present evidence of other crimes, wrongs and acts, listing two assaults that the Petitioner committed against Ms. Woods in 2004 and an assault that the Petitioner committed against the victim in 1996. The notice did not include another assault that the Petitioner committed against the victim in 1995, which was later admitted at trial. The Petitioner filed a motion in limine,

requesting that the trial court exclude the evidence of the prior bad acts and arguing that the evidence was highly prejudicial and that the danger of unfair prejudice outweighed its probative value. *See* Tenn. R. Evid. 404(b). During a hearing prior to the beginning of the trial, the trial court found that the evidence was relevant to establish intent and the absence of mistake but limited the State's presentation of the evidence to rebuttal. *See State v. Shropshire*, 45 S.W.3d 64, 75 (Tenn. Crim. App. 2000) (providing that while evidence of a prior crime, wrong, or act is not admissible to prove that a defendant had the propensity to commit the crime charged, it may be relevant and admissible to prove other issues such as identity, intent, motive, opportunity, or absence of mistake or accident). After co-counsel informed the trial court that he would like to question jurors about erotic asphyxiation during voir dire, the trial court allowed the State to present the evidence of the Defendant's prior assaults in its case-in-chief. During voir dire, co-counsel informed prospective jurors that they would hear about erotic asphyxiation and the Braswells' sexual practices.

The Petitioner contends that during opening statements, the prosecutor made statements utilizing the evidence of prior bad acts as propensity evidence in violation of Tennessee Rule of Evidence 404(b) and that trial counsel was ineffective in failing to object to the statements. The Petitioner challenges the following statements by the prosecutor:

> And you'll hear that just like the morning of November 5th, 2004, when he squeezed her neck as long and as hard as he needed to, to kill her, he had done it before in 1996 when they lived in Millington. Police were called. Pictures were taken. He got mad at Sheila Braswell and choked her.

> And you'll hear from Kristie Woods that in June of 2004, about September/October 2004, he got mad at her, too. And on both those occasions, he put his hands around her neck and choked her to get the message across.

Both the State and the defendant are entitled to make opening statements at the outset of the trial. T.C.A. § 20-9-301. The purpose of opening statements is "merely to inform the trial judge and the jury, in a general way, of the nature of the case and to outline, generally, the facts each party intends to prove." *State v. Sexton*, 368 S.W.3d 371, 415 (Tenn. 2012) (quoting *State v. Stout*, 46 S.W.3d 689, 713 (Tenn. 2001) (appendix), *superseded by statute on other grounds as recognized in State v. Odom*, 137 S.W.3d 572, 580 (Tenn. 2004)). These statements "must be predicated on evidence introduced during the trial of the case." *Id.* (quoting *State v. Sutton*, 562 S.W.2d 820, 823 (Tenn. 1978)). In order to measure the prejudicial impact of any prosecutorial

misconduct, this court should consider: (1) the conduct in light of the facts and circumstances of the case; (2) any curative measures undertaken by the court and the prosecutor; (3) the intent of the prosecution; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case. *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

The post-conviction court found that the prosecutor's statements were "highly inappropriate," and we agree. Although the trial court found that the Petitioner's prior incidents of violence against the victim and Ms. Woods were admissible to establish intent and the absence of mistake, the prosecutor did not argue that these prior bad acts established the Petitioner's intent to kill the victim or the absence of mistake. Rather, the prosecutor's statements constituted a blatant attempt to show the Petitioner's propensity to commit intentional, premeditated murder of the victim through manual strangulation based upon his prior conduct in choking the victim and Ms. Woods when he became angry. Tennessee Rule of Evidence 404(b) clearly prohibits the admission of evidence of prior bad acts to establish a defendant's propensity to commit the charged offense, and the prosecutor's argument to the jurors that they may consider the Petitioner's prior bad acts for this purpose was extremely improper. Trial counsel testified that he did not object to the prosecutor's argument because he believed that the argument was not improper, a belief that was clearly erroneous. Therefore, trial counsel was deficient in failing to object to the prosecutor's remarks during her opening statement.

Nevertheless, we cannot conclude that trial counsel's deficiency resulted in prejudice. We note that the prosecutor made these improper comments during opening statements of a week-long trial in support of her claim that the Petitioner committed intentional and premeditated murder. The jury, however, rejected the prosecutor's assertion that the victim's murder was intentional and premeditated and, instead, convicted the Petitioner of second degree murder. The evidence presented to support the conviction for second degree murder was overwhelming. We reiterate that the prosecutor's comments during opening statements were a blatant violation of both the trial court's ruling regarding the purposes for which the evidence was to be presented and Tennessee Rule of Evidence 404(b). While we do not condone the prosecutor's actions, we must conclude that in light of the jury's rejection of the State's claim that the murder was intentional and premeditated and the strength of the evidence supporting second degree murder, trial counsel's deficiency in failing to object to the improper statements did not result in prejudice.

### 2. Evidence of Prior Bad Acts

The Petitioner also contends that trial counsel was ineffective in failing to renew his objection to Ms. Woods's testimony about the Petitioner's two prior assaults against

her and in failing to renew his objection to "404(b) information" included in the order of protection that was admitted into evidence. The Petitioner failed to explain in his brief how trial counsel was deficient in not renewing his objections and failed to demonstrate that the renewal of the objections would have resulted in the exclusion of the evidence. On direct appeal, this court upheld the trial court's finding that the evidence of the Petitioner's prior assault against Ms. Woods was admissible under Rule 404(b). *See Vern Braswell*, 2008 WL 238014, at *14-16. The Petitioner is not entitled to relief with regard to this issue.

### 3. Lay Opinions and Hearsay

The Petitioner argues that trial counsel failed to object to improper lay opinions from Mr. Burton, Sergeant Merritt, and Sergeant Kjellin. In his brief, the Petitioner fails to identify what testimony that he alleges was improper and how the testimony is improper and fails to cite to the record in support of his claim. *See* Tenn. Ct. Crim. App. R. 10(b); Tenn. R. App. P. 27(a)(7). The Petitioner also argues that trial counsel failed to object to "hearsay contained within the jail phone calls, including his own statements," "several instances of hearsay testimony that was also 404(b) information," and "questioning of [the Petitioner] about statements made by [the victim]." The Petitioner fails to specify in his brief those statements which he maintains were hearsay and fails to cite to the record in support of his claim. *See* Tenn. Ct. Crim. App. R. 10(b); Tenn. R. App. P. 27(a)(7). Accordingly, these issues are waived.

### E. Failure to Effectively Cross-Examine Witnesses

The Petitioner asserts that trial counsel should have cross-examined Dr. Carter about her "questionable work history," Ms. Woods about her harassing the victim and a pattern of erotic asphyxiation in the sexual relationship between the Petitioner and Ms. Woods, and Ms. Magra Hardin about her knowledge of the victim's affair while the Petitioner was in a rehabilitation facility. As this court has previously recognized, however, "cross-examination is a strategic and tactical decision of trial counsel, which is not to be measured by hindsight." *State v. Kerley*, 820 S.W.2d 753, 756 (Tenn. Crim. App. 1991). "Counsel has some discretion in conducting the defense and is entitled to use his best judgment in matters of trial strategy or tactics." *Gregory G. Kilgore v. State*, No. M2012-01296-CCA-R3-PC, 2013 WL 3326663, at *7 (Tenn. Crim. App. June 27, 2013) (citing *McBee v. State*, 655 S.W.2d 191, 193 (Tenn. Crim. App. 1983)).

We note that although co-counsel cross-examined Dr. Carter at trial, co-counsel did not testify at the post-conviction hearing and, therefore, was not questioned about his reasons for not asking certain questions on cross-examination. Nevertheless, trial counsel testified at the post-conviction hearing that he and co-counsel knew that the trial court

would accept Dr. Carter as an expert regardless of the allegations and believed that the trial court would not allow them to question her about the allegations on the front end. Trial counsel explained that they believed the better approach was to attempt to have Dr. Carter open the door to questioning about the allegations. However, there is nothing in the record suggesting that Dr. Carter ever opened the door to questioning about the allegations at trial. Furthermore, as noted by the post-conviction court, co-counsel elicited many favorable admissions from Dr. Carter, including that the victim's body had no defensive wounds and that the necklace that the victim was wearing likely would have been pulled apart had a struggle occurred. Dr. Carter also made admissions regarding erotic asphyxiation and signs that a death occurred from erotic asphyxiation that were favorable to the defense. Accordingly, we conclude that co-counsel was not deficient. Furthermore, if there had been a deficiency, it would not have resulted in prejudice.

Co-counsel also conducted the cross-examination of Ms. Hardin at trial. Nevertheless, trial counsel testified that while he was aware that the victim was accused of having an affair while the Petitioner was enrolled in a rehabilitation program, the defense did not present the evidence at trial because he believed that the evidence would be hearsay, he did not want to demonize the victim, and he did not want to open the door to evidence of all of the victim's good deeds. We conclude that co-counsel was not deficient in his cross-examination of Ms. Hardin.

Trial counsel testified regarding the caution he had to employ in questioning Ms. Woods on cross-examination. On the night prior to testifying at trial, Ms. Woods informed trial counsel that the Petitioner called her on the night of the victim's death and asked her whether she was ready to be "number one." Trial counsel believed that if this information came out at trial, the Petitioner would have been convicted of first degree murder. After briefly questioning Ms. Woods about her conversation with the Petitioner following the victim's death, trial counsel attempted to push Ms. Woods in a different direction by asking her about the Petitioner's community involvement. Moreover, Ms. Woods admitted on direct examination to slashing the tires on the victim's car after she became angry at the victim, and she denied that she and the Petitioner engaged in choking while having sex. We conclude that trial counsel applied a reasonable strategy in his cross-examination of Ms. Woods.

### F. Failure to Recall Mr. Wright as a Witness at Trial

At trial, trial counsel called Mr. Wright, who testified that he initially represented the Petitioner and visited him at the Homicide Office in the Memphis Police Department shortly after the Petitioner's arrest. When trial counsel asked Mr. Wright whether he asked the Petitioner what had occurred, the State objected on the basis of hearsay. During a bench conference, trial counsel explained that the State had argued that the

Petitioner had not told anyone about engaging in erotic asphyxiation with the victim on the night of her death until shortly before trial, that Mr. Wright would testify that the Petitioner informed him about the erotic asphyxiation, and that Mr. Wright instructed the Petitioner to not make any other statements to the police. Trial counsel and co-counsel argued that the statements were not hearsay because they were not being offered for the truth of the matter asserted but to rebut the State's argument that the Petitioner's claim of erotic asphyxiation was recently fabricated. The trial court found that the proposed testimony was hearsay and that the Petitioner's statement would be self-serving and sustained the State's objection. The trial court stated that it might revisit the issue after the Petitioner testified. Trial counsel did not recall Mr. Wright following the Petitioner's testimony at trial.

The Petitioner contends that trial counsel was ineffective in failing to recall Mr. Wright to testify at the trial. We note that the trial court erred in ruling that the proposed testimony was inadmissible hearsay. Testimony that the Petitioner informed Mr. Wright that he engaged in erotic asphyxiation with the victim prior to the death and that Mr. Wright advised the Petitioner against making an additional statement to the police to include this information was not hearsay because it was not being offered for the truth of the matter asserted but was being offered to rebut the State's claim on a concocted defense. *See* Tenn. R. Evid. 801(c) ("'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."). Nevertheless, trial counsel testified that he did not wish to present additional testimony from Mr. Wright because he did not want the State to present evidence in rebuttal to establish that the Petitioner did not mention erotic asphyxiation to the paramedics, police officers, and others with whom he had spoken following the victim's death. Moreover, as noted by the post-conviction court, the Petitioner testified at trial that he wanted to make an additional statement to the police admitting to engaging in erotic asphyxiation with the victim prior to her death but that Mr. Wright advised him against it. We conclude that trial counsel was not deficient and that any deficiency did not result in prejudice.

### G. Breach of Fiduciary Duty

The Petitioner asserts that trial counsel breached his fiduciary duties by failing to pay Dr. Nichols from funds provided by the Petitioner's family. However, the post-conviction court credited trial counsel's testimony that he was certain co-counsel paid Dr. Nichols. The Petitioner did not call co-counsel to testify at the post-conviction hearing. Accordingly, the Petitioner has failed to establish by clear and convincing evidence that trial counsel neglected to pay Dr. Nichols for his services.

### H.  Failure to Fulfill a Promise Made During Opening Statements

The Petitioner contends that co-counsel promised the jury during opening statements that the evidence would show a pattern of erotic asphyxiation and that trial counsel failed to establish this pattern through Ms. Woods.  The Petitioner, however, failed to specify what statements from co-counsel's opening statement amounted to a promise to establish a pattern of erotic asphyxiation and failed to include citations to the record to support his claim.  *See* Tenn. Ct. Crim. App. R. 10(b); Tenn. R. App. P. 27(a)(7).

Regardless, the Petitioner is not entitled to relief.  In certain circumstances, the failure to present evidence promised during the opening statement constitutes ineffective assistance of counsel.  *State v. Zimmerman*, 823 S.W.2d 220, 225-26 (Tenn. Crim. App. 1991).  "'The trial attorney should only inform the jury of the evidence that he is sure he can prove.... His failure to keep [a] promise [to the jury] impairs his personal credibility.'"  *Id*. at 225 (quoting Patrick L. McCloskey, *Criminal Law Desk Book*, § 1506(3)(O) (Matthew Bender, 1990)).  During the opening statements, co-counsel informed the jury that the Petitioner and the victim had been engaging in erotic asphyxiation for a number of years and that the Petitioner and Ms. Woods also engaged in erotic asphyxiation.  Trial counsel testified that the defense intended to establish the pattern of erotic asphyxiation through the Petitioner's testimony.  While Ms. Woods testified that she did not know what the term "erotic asphyxia" meant before the trial, she acknowledged that the Petitioner sometimes placed his forearm against her neck and applied pressure while they had sexual intercourse.  The Petitioner testified at trial that he and the victim had been engaging in erotic asphyxiation for a number of years and that the position in which they engaged was the position described by Ms. Woods in her testimony.  We conclude that the defense did not fail to fulfill a promise made to the jury during opening statements and that the Petitioner is not entitled to relief regarding this issue.

## II.  Prosecutorial Misconduct

The Petitioner contends that the State committed prosecutorial misconduct by failing to provide trial counsel prior to trial with the contents of the sealed envelope, multiple statements of witnesses, and items taken from the Petitioner's home.  The Petitioner maintains that the State's failure to provide these items violated *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

In *Brady,* the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or

bad faith of the prosecution." 373 U.S. at 87. In order to establish a *Brady* claim, a defendant must establish the following:

> 1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information, whether requested or not);
>
> 2. The State must have suppressed the information;
>
> 3. The information must have been favorable to the accused; and
>
> 4. The information must have been material.

*State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995).

Evidence is "favorable" if it is deemed to be exculpatory in nature or could be used to impeach the State's witnesses. *Johnson v. State*, 38 S.W.3d 52, 55-56 (Tenn. 2001). "'[E]vidence which provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness'" falls within the *Brady* disclosure requirement. *State v. Jackson*, 444 S.W.3d 554, 593 (Tenn. 2014) (quoting *Johnson*, 38 S.W.3d at 56-57). The State's duty to disclose extends to all favorable evidence regardless of whether the evidence is admissible at trial. *Brady*, 373 U.S. at 87. *Brady* applies to both evidence in the prosecution's file and "any favorable evidence known to others acting on the government's behalf in the case, including the police." *Jackson*, 444 S.W.3d at 594 (citations omitted). The State's duty to disclose does not extend to information the defendant already possesses or is able to obtain or to information not in the possession of the prosecution or another governmental agency. *State v. Marshall*, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992).

Evidence is "material" if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). Accordingly, a "reasonable probability" of a different result is established when "the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Id.* (quoting *Bagley*, 473 U.S. at 678). Materiality requires a "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to

undermine confidence in the verdict." *Id.* at 435. In determining whether the evidence is material, the suppressed evidence must be "considered collectively, not item by item." *Id.* at 436.

Whether a petitioner is entitled to a new trial based upon a *Brady* violation "presents a mixed question of law and fact." *Cauthern v. State*, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004).

> The lower court's findings of fact, such as whether the defendant requested the information or whether the state withheld the information, are reviewed on appeal *de novo* with a presumption that the findings are correct unless the evidence preponderates otherwise. The lower court's conclusions of law, however, such as whether the information was favorable or material, are reviewed under a purely *de novo* standard with no presumption of correctness.

*Id.*

## A. Statements of Witnesses

The Petitioner contends that the State violated *Brady* by failing to provide trial counsel with the statements of Ms. Sheronda Smith, Ms. Magra Hardin, Lieutenant Fred Jackson, Mr. Brian James, Ms. Renee Welch, and Ms. Karen Taylor prior to trial. The Petitioner requested the statements of witnesses and all exculpatory information in a motion filed prior to trial. *See Edgin*, 902 S.W.2d at 389. The State, however, responds that the prosecution did not suppress the information included in the statements. We agree with the State.

The Petitioner notes that (1) information regarding the victim's decision to terminate the divorce proceedings was included in the statements of Ms. Smith and Ms. Taylor; (2) information regarding the Braswells' sexual lifestyle was included in the statements of Ms. Smith, Ms. Taylor, and Ms. Welch; (3) information regarding the victim's prior episodes of paralysis was included in the statements of Ms. Smith, Ms. Taylor, Ms. Hardin, and Ms. Welch; (4) information regarding hair found in the Jacuzzi following the victim's death was included in the statements of Ms. Smith and Ms. Taylor; and (5) information regarding the Petitioner's emotional state following the victim's death was included in the statements of Mr. James and Lieutenant Jackson.

The evidence presented at the post-conviction hearing, however, established that the State provided the information to trial counsel in discovery in a different form or that trial counsel learned of the information through his own investigation. The State

included the victim's statement that although she had filed for divorce, she and the Petitioner were trying to work through their problems in a supplemental police report that summarized an officer's conversation with Ms. Taylor a few days before her formal statement. The State provided trial counsel with information regarding the Braswells' sexual lifestyle in a supplemental police report summarizing an officer's conversation with Ms. Smith a few days before her formal statement. Trial counsel was aware of the Braswells' sexual lifestyle and interviewed multiple witnesses regarding this lifestyle in preparing for trial. The State included information regarding the victim's prior episodes of paralysis in supplemental police reports summarizing officers' conversations with the victim's prior employer, a friend of the victim, and Ms. Taylor and Ms. Welch a few days before their formal statements. Trial counsel also obtained the victim's medical records, which included the information, and investigated the prior episodes in preparing for trial. He was also aware of the discovery of the victim's hair in the Jacuzzi following her death and decided against pursuing the issue at trial. The State provided trial counsel with a transcript of the preliminary hearing during which Sergeant Merritt testified regarding the Petitioner's emotional state following the victim's death and supplemental police reports summarizing conversations with the victim's brother and the Petitioner's neighbor during which they discussed the Petitioner's emotional state.

Moreover, Ms. Smith, Ms. Hardin, and Lieutenant Jackson testified at trial, and the post-conviction court credited trial counsel's testimony that he received the statements of each witness who testified at trial following their testimony on direct examination. "[D]elayed disclosure requires an inquiry into whether the delay prevented the defense from using the disclosed material effectively in preparing and presenting the defendant's case." *State v. Caughron*, 855 S.W.2d 526, 548 (Tenn. 1993) (citing *United States v. Ingraldi*, 793 F.2d 408 (1st Cir. 1986)); see *State v. Joan Elizabeth Hall*, No. 01C01-9710-CC-00503, 1999 WL 34782, at *9 (Tenn. Crim. App. Jan. 28, 1999), *perm. app. denied* (Tenn. July 12, 1999) ("[I]f there is only a delayed disclosure of information, in contrast to a complete failure to disclose exculpatory information, *Brady* normally does not apply, unless the delay itself causes prejudice."). The Petitioner has failed to establish that the State's delay in providing the statements of Ms. Smith, Ms. Hardin, and Lieutenant Jackson to trial counsel prevented him from using the evidence in presenting and preparing the Petitioner's case for trial. The Petitioner is not entitled to relief regarding this issue.

### B. Items Taken from the Petitioner's Home

The Petitioner asserts that the State violated *Brady* by failing to provide in discovery various items taken from his home. While the Petitioner did not identify the items in his brief, post-conviction counsel clarified during oral argument that the items included a document that appeared to be the victim's handwritten journal and two

typewritten letters between the Petitioner and the victim. During oral argument, the State argued that the Petitioner raised the issue in his post-conviction petition as a violation of Tennessee Rule of Criminal Procedure 16 and not as a *Brady* violation and that as a result, the Petitioner waived the issue for purposes of appeal. However, upon reviewing the Petitioner's fourth amended petition, we conclude that while not a model of clarity, the petition fairly raised the issue as a violation of *Brady*, and, therefore, we will address the merits of the Petitioner's claim.

In rejecting the Petitioner's claim, the post-conviction court found that the documents were not exculpatory. The victim's handwritten journal was dated approximately two years before the victim's death, and her letter to the Petitioner was dated approximately eight months prior to her death. The journal and both letters discuss the marital discord between the Braswells and do not include any information that was favorable to the defense. *See Brady*, 373 U.S. at 87; *Jackson*, 444 S.W.3d at 593. Accordingly, the State's nondisclosure of the documents does not violate *Brady*.

## C. The Missing Envelope

The Petitioner maintains that the State violated *Brady* and *State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999), by failing to disclose to the defense items that were included in a sealed envelope that has since gone missing. The State responds that "it is clear the post-conviction court credited the testimony of the district attorneys and considered the contents of the manila folder marked as Exhibit 6 to be the same as the contents of the supposedly missing envelope, if there ever was a missing envelope." We disagree with the State's characterization of the post-conviction court's findings.

In its findings of fact, the post-conviction court stated:

Petitioner alleges that the [S]tate should have disclosed the contents of a folder located by [General Carriker] in October 2013. At the hearing for post-conviction relief, General Carriker testified that on top of the folder, he saw a sticky note dated August 22, 2005, and initialed by General Weirich. The folder [General] Carriker located had a tab inscribed "items not turned over." There was a sticky note on the front of the folder dated August 22, 2005, with General Weirich's initials, stating "I am NOT giving these items in discovery." The sticky note also contains an inscription which appears to be in different handwriting dated December 6, 2005, indicating that *Jencks* statements of witnesses were turned over to the defense at the appropriate time. General Weirich testified that she wrote the December 6 inscription.

General Carriker believed that the contents of the folder have previously been in a sealed manila envelope, and that the original envelope had been lost. General Weirich testified at the hearing for post-conviction relief that she did not know anything about the envelope or folder prior to a conversation with General Carriker in 2011 during the pendency of these proceedings. She testified that it was possible that the manila envelope contained items provided by the victim's family which were added to the case file while the case was still in General Sessions Court.

(Internal citations omitted.) The post-conviction court summarized General Weirich's testimony that although she did not provide the statements of witnesses in discovery, she provided supplemental police reports to defense counsel that provided a summary of the witnesses' testimony. The post-conviction court further found:

[General] Weirich testified that it was her routine practice to keep a separate copy of items she had not yet turned over to the defense, particular[ly] *Jencks* statements, so she would remember to turn the materials over at the appropriate time. General [Wiseman], who was the division leader in charge of this case in 2011, confirmed that it was standard procedure to keep copies of *Jencks* statements in a separate folder with a sticker indicating that the statements should not be turned over to the defense during discovery. [General Wiseman] testified that the purpose of this organizational system is to ensure that *Jencks* statements are disclosed after the direct testimony of each respective witness.

(Internal citations omitted.)

However, the post-conviction court's factual findings do not accurately reflect General Carriker's testimony at the post-conviction hearing. General Carriker did not testify that he believed that the contents of the folder had been in a sealed manila envelope and that the original envelope had been lost. Rather, he testified that he located a sealed manila envelope that was approximately one-half of an inch thick and appeared to contain between one and one hundred pages. He stated that the outside of the manila envelope had a four-inch by four-inch "yellow sticky pad note" with language similar to "not turned over or do not turn over to defense" and General Weirich's initials at the bottom with a date of "2005 or so."

General Carriker testified that after he learned that the envelope could not be located during the pendency of the post-conviction proceedings, he went to General Young's office to search the State's file and located a folder that was later entered into evidence as Exhibit 6. He stated that the manila envelope was a darker color than the file

folder and that the manila envelope was standard-sized for letter-sized paper, while the folder was a legal-sized file. General Carriker also described the seal on the envelope. He stated that the pages in the folder were "close to the thickness" of the envelope and that the language on the note that was on the folder was similar to the language on the note that was on the envelope. He acknowledged that he was uncertain whether the note on the folder was the same note that was on the envelope.

The Petitioner argued in the post-conviction court that the State's failure to provide the defense with the contents of the missing envelope violated *Brady*. However, the post-conviction court analyzed whether the State violated *Brady* by failing to provide the defense with the documents in Exhibit 6 without expressly finding that the missing envelope was actually the file folder that was entered as Exhibit 6. The post-conviction court found that the

> Petitioner has failed to show by clear and convincing evidence that the information contained in Exhibit 6 was improperly withheld, that it was favorable to Petitioner, or that it was relevant and material to the preparation of Petitioner's defense. This Court finds that Petitioner's theory of intentional non-disclosure is less plausible than the [S]tate's reasonable explanation that the documents contained in Exhibit 6 were either witness statements turned over to the defense at trial under *Jencks* or products of the [S]tate's investigation not subject to discovery.

The post-conviction court also found that "[a]lthough the folder that is now Exhibit 6 may have been misplaced during the lengthy course of these post-conviction proceedings, the unavailability of these documents did not likely prejudice [the] Petitioner's ability to present a defense because he either received the documents at the appropriate time or was never entitled to disclosure of the documents."

Regardless of the shortcomings of the post-conviction court's findings, no proof was presented at the post-conviction hearing that could lead to the conclusion that the documents later found in an open file folder which became Exhibit 6 were the contents of the missing envelope. Only two witnesses, Ms. Eskridge and General Carriker, acknowledged that they saw the sealed manila envelope, and they both testified that they never viewed the contents of the now missing sealed manila envelope. While the State appears to suggest in its brief that the missing sealed envelope never existed, the testimony of Ms. Eskridge and General Carriker, their discussions with the post-conviction court during hearings prior to the evidentiary hearing, and the post-conviction court's findings belie the State's claim.

Some of the most disturbing circumstantial evidence from the post-conviction hearing is Ms. Eskridge's testimony that the State failed for more than one year to schedule an opportunity for her to review the State's file as discovery in the post-conviction case. She was told that no one knew where the file was located; she was given different reasons why she could not have access to the file; and she was even told by General Davis that the file was in *California*. It was not until General Carriker was assigned the post-conviction case that Ms. Eskridge was granted access to the State's file. The olfactory perception of the missing sealed manila envelope is not pleasant.

Nevertheless, there appears to be no way to determine the contents of the missing sealed manila envelope by even a preponderance of the evidence standard, much less by a clear and convincing standard. Because there is no evidence as to the contents of the missing envelope, there also is no evidence that the contents included *Brady* material.

The Petitioner urges this Court to apply *State v. Ferguson*, 2 S.W.3d 912, 917 (Tenn. 1999), which stands for the proposition that the loss or destruction of potentially exculpatory evidence may violate a defendant's right to a fair trial. "[T]he State's duty to preserve evidence is limited to constitutionally material evidence described as 'evidence that might be expected to play a significant role in the suspect's defense.'" *State v. Merriman*, 410 S.W.3d 779, 785 (Tenn. 2013) (quoting *Ferguson*, 2 S.W.3d at 917). If the State fails in its duty, the trial court must examine (1) the degree of negligence involved; (2) the significance of the destroyed evidence in light of the probative value and reliability of the secondary or substitute evidence that remains available, and (3) the sufficiency of the other evidence used at trial to support the conviction in order to determine whether the trial conducted without the missing or destroyed evidence would be fundamentally fair. *Id.*

As this court has recognized, it is unclear whether *Ferguson*, which discusses remedies for the State's failure to preserve evidence prior to trial, even applies in the post-conviction context. *See Tommy Nunley v. State*, No. W2014-01776-CCA-R3-PC, 2015 WL 1650233, at *3 (Tenn. Crim. App. Apr. 13, 2015); *Tommy Nunley v. State*, No. W2003-02940-CCA-R3-PC, 2006 WL 44380, at *6 n.3 (Tenn. Crim. App. Jan. 6, 2006); *Edward Thompson v. State*, No. E2003-01089-CCA-R3-PC, 2004 WL 911279, at *2 (Tenn. Crim. App. Apr. 29, 2004). Both the United States and Tennessee Supreme Courts have held that the full scope of due process protections does not extend to post-conviction proceedings. *Pennsylvania v. Finley*, 481 U.S. 551, 554-55 (1987); *Stokes v. State*, 146 S.W.3d 56, 60 (Tenn. 2004). "All that due process requires in the post-conviction setting is that the defendant have 'the opportunity to be heard at a meaningful time and in a meaningful manner.'" *Stokes*, 146 S.W.3d at 61 (quoting *House v. State*, 911 S.W.2d 705, 711 (Tenn. 1995)).

Even if *Ferguson* applied to post-conviction proceedings, the Petitioner's claim under *Ferguson* fails for the same reason that his *Brady* claim fails, that is, the lack of evidence as to the contents of the missing envelope. For example, we cannot determine whether the evidence was destroyed or the significance of any destroyed evidence in light of the probative value and reliability of the secondary or substitute evidence that remains available. The Petitioner, who has the burden of proof in post-conviction cases, failed to meet his burden to present clear and convincing evidence to support his claims.

Ms. Eskridge testified that she trusted General Carriker to obtain permission to unseal the envelope and show her the contents. From the record, there is absolutely nothing to indicate that her trust was misplaced. It is unfortunate to conclude that, in retrospect, Ms. Eskridge should have taken additional steps, such as taking multiple photographs with a cellular phone of the now missing sealed manila envelope and the note and attaching the photographs to a promptly filed motion for a protective order requiring the State to preserve the sealed envelope in its then current condition.

We are left with evidence that a sealed manila envelope, which was approximately one-half-inch thick and had a yellow note with language that it should not be turned over to the defense, was discovered in the State's file and that the sealed envelope went missing from the State's file while in the State's possession without the State ever revealing the contents of the envelope to the Petitioner or the post-conviction court. However, the Petitioner bears the burden of proof in this post-conviction case. Through absolutely no fault of the Petitioner or his post-conviction counsel, there is no evidence that any *Brady* material was inside the now missing sealed envelope. Accordingly, we must conclude that the Petitioner is not entitled to relief.

### III. Cumulative Error

The Petitioner argues that the cumulative effect of the errors of trial counsel and the State entitles him to relief. The cumulative error doctrine recognizes that in some cases there may be multiple errors committed during the trial proceedings, which standing alone constitute harmless error; however, considered in the aggregate, these errors undermined the fairness of the trial and require a reversal. *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). We have concluded that trial counsel was deficient in failing to interview Ms. Lane, review the recordings of the Petitioner's telephone conversations from jail prior to trial, and object to the prosecutor's improper remarks during opening statements. However, we cannot conclude that such deficiencies when considered individually or together resulted in prejudice in light of the strong evidence supporting the Petitioner's conviction for second degree murder.

## CONCLUSION

Upon reviewing the record and the applicable law, we affirm the judgment of the post-conviction court.

_____
JOHN EVERETT WILLIAMS, JUDGE